No. 19-15839

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

GREG GIBBONS,
*Plaintiff/Appellee*,

v.

UNION PACIFIC RAILROAD COMPANY
*Defendant/Appellant*.

On Appeal from the United States District Court
for the District of Nevada
No. 2:15-cv-02231-GMN-CWH
Hon. Gloria M. Navarro

_____

## DEFENDANT/APPELLANT'S OPENING BRIEF

_____

Pat Lundvall, Nev. Bar No. 3761
Amanda C. Yen, Nev. Bar No. 9726
McDONALD CARANO LLP
2300 W. Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
lundvall@mcdonaldcarano.com
ayen@mcdonaldcarano.com

*Attorneys for Defendant/Appellant Union Pacific Railroad Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, defendant/appellant Union Pacific Railroad Company ("Union Pacific") submits this corporate disclosure statement. Union Pacific is a Delaware corporation and a wholly owned subsidiary of Union Pacific Corporation, a Utah corporation. Union Pacific Corporation is a publicly traded company whose shares are listed on the New York Stock Exchange. Based on filings with the United States Securities and Exchange Commission, Union Pacific believes that no publicly held corporation owns ten percent or more of Union Pacific Corporation's outstanding shares.

Counsel of record for Union Pacific certifies that the above listed parties have a pecuniary interest in the outcome of the case. These representations are made to enable the judges of the court to evaluate possible disqualifications or recusal.

Date: August 30, 2019

McDONALD CARANO LLP

*/s/ Pat Lundvall*
Pat Lundvall, Nev. Bar No. 3761
Amanda C. Yen, Nev. Bar No. 9726
2300 W. Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
lundvall@mcdonaldcarano.com
ayen@mcdonaldcarano.com
*Attorneys for Defendant/Appellant*
*Union Pacific*

ii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

TABLE OF CONTENTS .................................................................... iii

TABLE OF AUTHORITIES .................................................................. vi

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATEMENT OF THE ISSUES ...............................................................3

STATEMENT OF THE CASE .................................................................4

    I.    Gibbons Failed To Offer Evidence Of An Essential Element Of His FELA Claim ...................................................................................4

        A.    Gibbons Was Not Aware Of Any Problems With The Bridge On The Date Of The Incident .........................................4

        B.    Union Pacific Did Not Learn Or Should Have Learned Of A Potential Hazard With The Bridge.........................................7

                1.    The Instruction To The Jury Contained The Correct Legal Standard That Union Pacific Is Only Liable If It Learned Or Should Have Learned Of A Hazard...........7

                2.    Through Randy Winn, Former Union Pacific Bridge Inspector, Gibbons Offered Evidence That Union Pacific Did *Not* Learn, Nor Should Have Learned Of A Hazard ......................................................8

                3.    Through His Forensic Engineer Witness, Mark Burns, Gibbons Set Forth Additional Evidence To Support A Finding That Union Pacific Did Not Learn, Nor Should Have Learned About A Hazard .......12

    II.    The Evidence Presented Does Not Support The Jury's Awards For Gibbons' Damages.........................................................................13

A.   Evidence Of Gibbons' Medical Complaints And Potential Future Medical Expenses Presented At Trial ............................13

B.   After The Incident, The Jury Learned Gibbons Continued To Work For Union Pacific And Was Still Working For Union Pacific At The Time Of Trial.........................................18

III.   Union Pacific Obtained Two Favorable Pretrial Rulings On Future Medical Damages And Work Life Capacity, Which Were Ignored At Trial....................................................................20

A.   The Magistrate Judge Precluded Gibbons From Presenting An Expert Witness To Testify To Gibbons' Future Damages Reduced To Present Value........................................20

B.   The District Court Judge Precluded Gibbons From Presenting Evidence Of Work Life Capacity Reduced To A Number..................................................................................22

C.   However, The District Court Allowed Gibbons To Violate The Evidentiary Rulings At Trial ...............................................26

IV.   The District Court Denies Union Pacific's Post-Judgment Motion. .........................................................................................27

SUMMARY OF THE ARGUMENT .....................................................................28

ARGUMENT ............................................................................................................29

I.   Legal Standard Of Review. ...............................................................29

A.   The Court Reviews A District Court's Denial Of A Motion For A New Trial And/Or Motion To Alter Or Amend The Judgment For An Abuse Of Discretion ....................................29

B.   The Court Reviews A District Court's Evidentiary Rulings For An Abuse Of Discretion. ....................................................31

II.    The District Court Abused Its Discretion When It Denied Union Pacific's Post-Judgment Motion Because Gibbons Did Not Prove An Essential Element Of His FELA Claim – That Union Pacific Learned Or Should Have Learned That The Bridge Would Fail ................................................................................32

III.   Because Each And Every Category Of Damages Awarded By The Jury Violates Well-Established Law And/Or Is Against The Clear Weight Of Evidence, The District Court Abused Its Discretion In Denying Union Pacific's Post-Judgment Motion ........36

    A.    The District Court Erred In Allowing Gibbons' Expert To Testify On Future Medical Damages Without Discounting For Present Value ....................................................36

    B.    The District Court Erred In Allowing Closing Argument On Gibbons' Work Life Capacity, Which Was Based Solely On Speculation, And The Evidence Presented Proved That Gibbons Would Not Suffer Any Future Lost Wages Or Benefits ...................................................39

    C.    The Jury's Award for Pain And Suffering Is Against The Clear Weight Of The Evidence And Excessive ........................41

CONCLUSION .........................................................................................43

STATEMENT OF RELATED CASES ...................................................45

CERTIFICATE OF COMPLIANCE ......................................................46

CERTIFICATE OF SERVICE ...............................................................47

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Affiliated Mfrs., Inc. v. Aluminum Co. of America*,
   56 F.3d 521 (3rd Cir. 1995) .................................................................32

*Allstate Ins. Co. v. Herron*,
   634 F.3d 1101 (9th Cir. 2011) ..........................................................31

*Bankcard America, Inc. v. Universal Bancard Systems, Inc.*,
   203 F.3d 477 (7th Cir. 2000) .............................................................29

*Beachy v. Boise Cascade Corp.*,
   191 F.3d 1010 (9th Cir. 1999) ..................................................... 32, 38

*Cobb v. Rodriguez*,
   751 Fed.Appx. 988 (9th Cir. 2018)....................................................32

*Crowley v. Epicept Corp.*,
   883 F.3d 739 (9th Cir. 2018) .............................................................29

*CSX Transp., Inc. v. McBride*,
   131 S.Ct. 2630, 564 U.S. 685 (2011)................................................33

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,
   762 F.3d 829 (9th Cir. 2014) ....................................................... 30, 39

*Fenner v. Dependable Trucking Co., Inc.*,
   716 F.2d 598 (9th Cir. 1983) .............................................................31

*Gallose v. Long Island R. Co.*,
   878 F.2d 80 (2nd Cir. 1989)...............................................................32

*Gorniak v. National R.R. Passenger Corp.*,
   889 F.2d 481 (9th Cir. 1989) ....................................................... 39, 41

*Kode v. Carlson*,
   596 F.3d 608 (9th Cir. 2010) .............................................................31

*Longoria v. Hunter Express, Limited*,
   932 F.3d 360 (9th Cir. 2019) .............................................................42

*Moist Cold Refrigerator Co. v. Lou Johnson Co.*,
  249 F.2d 246 (9th Cir. 1957) ...............................................................30

*Monessen Southwestern Ry. Co. v. Morgan*,
  108 S.Ct. 1837, 486 U.S. 330 (1988)................................. 36, 37, 38, 41

*Neill v. Diamond M. Drilling Co.*,
  426 F.2d 487 (5th Cir. 1970) ...............................................................42

*Norfolk & W. Ry. Co. v. Liepelt*,
  100 S.Ct. 755, 444 U.S. 490 (1980)...................................................41

*Ollier v. Sweetwater Union High Sch. Dist.*,
  768 F.3d 843 (9th Cir. 2014) ...................................................... 32, 38

*Sharp Structural, Inc. v. Franklin Mfg., Inc.*,
  283 Fed.Appx. 585 (9th Cir. 2008)........................................ 30, 31, 41

*St. Louis Southwestern Ry. Co. v. Dickerson*,
  105 S.Ct. 1347, 470 U.S. 409 (1985)..................................................38

## Statutes

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 1331 ..................................................................................3

45 U.S.C. § 51-60.............................................................................1, 3

## Rules

Fed. R. App. P. 32 ...............................................................................46

Fed. R. Civ. P. 4 ...................................................................................3

Fed. R. Civ. P. 26.1 .............................................................................. ii

Fed. R. Civ. P. 59 .......................................................................... passim

vii

# INTRODUCTION

Plaintiff/appellee Greg Gibbons ("Gibbons") asserted one cause of action brought under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51-60, *et seq.*, against his employer, defendant/appellant, Union Pacific. Gibbons alleged that Union Pacific failed in its duty to exercise ordinary care to provide its employees with a safe place to work when a Union Pacific-owned bridge collapsed under Gibbons on December 9, 2012.

To prevail on his claim, Gibbons first had to prove Union Pacific learned or should have learned that the bridge would collapse. It is well-settled that an employer is not liable for negligence under FELA if it had no reasonable way of knowing that a potential hazard exists. The evidence presented at trial demonstrated that Union Pacific acted within the industry standard of care in inspecting the bridge to learn of any potential hazard. In fact, Union Pacific inspected the bridge exactly two months prior to the incident and did not find any defects that raised concern. Also, Gibbons had been working in that area, crossing the bridge the day before the incident, and was unaware of any defect and therefore did not notify Union Pacific of any potential defect. The evidence at trial belies the jury's verdict that found Union Pacific liable.

Equally important, several maladies plague each and every category of damages awarded to Gibbons by the jury. As a threshold issue, it was undisputed at

the time of trial that Gibbons was back to work at Union Pacific working in the same position at the same rate/scale of pay (and in fact continues to date), Gibbons sustained no wage loss, and all future medical expenses, if any, would be paid by Union Pacific pursuant to a collective bargaining agreement. The only financial loss sustained by Gibbons was medical costs in the amount of $7,500.00. Yet, the jury awarded Gibbons $5,000,000.00; this sum was far in excess of that requested by Gibbons and was unsupported by the evidence.

For medical and hospital expenses likely to be incurred in the future ("Future Medical Costs"), the jury failed to award Gibbons those costs discounted for present value; thus, the damages awarded are excessive. For lost wages and benefits in the future ("Lost Wages"), the jury based its award on pure speculation and, considering both the evidence presented and the amount requested by Gibbons for his Lost Wages, the award was excessive. Finally, for mental and emotional humiliation or pain and anguish and physical pain and suffering ("Pain and Suffering"), Gibbons failed to present substantial evidence to support the jury's award. Compounding these errors was the district court's failure to enforce evidentiary rulings that would have prohibited the jury from awarding damages in violation of the law and against the clear weight of evidence.

For these reasons, Union Pacific filed a Motion to Alter or Amend the Judgment Pursuant to FRCP 59(e); and Motion for New Trial or, in the alternative,

2

for Remittitur Pursuant to FRCP 59(a) (the "Motion"), which the district court denied. Because Gibbons failed to prove an essential element of his claim and the jury's collective damages award violates well-established law and is against the clear weight of the evidence, Union Pacific requests this Court reverse the district court's Order denying Union Pacific' Motion and alter or amend the judgment, order a new trial, or, alternatively, issue a remittitur.

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Nevada had subject-matter jurisdiction over the underlying matter pursuant to 28 U.S.C. § 1331. Gibbons brought his action against Union Pacific under 45 U.S.C. §§ 51-60, *et seq.* This Court has subject-matter jurisdiction under 28 U.S.C. § 1291 because this appeal arises from the final judgment disposing of all claims and entered in the District of Nevada on May 8, 2018 and the March 25, 2019 Order denying Union Pacific's Motions to Amend Judgment or in the alternative Motion for New Trial or Remittitur ("Order"). Union Pacific filed this appeal on April 22, 2019. It is therefore timely under Rule 4(a) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUES

<u>Issue #1</u>: A claim for negligence under the Federal Employers' Liability Act required Gibbons to prove that Union Pacific learned or should have learned that the bridge in question was a hazard on December 9, 2012. Gibbons, however, failed to

present evidence of this essential element. Despite Gibbons' failure to prove all elements of his claim for negligence, the district court denied Union Pacific's Motion. Did the district court err in denying Union Pacific's Motion when Gibbons did not prove all elements necessary to prevail on his claim for negligence?

Issue #2: Did the district court err in denying Union Pacific's Motion when each category of the jury's damages award suffers from a combination of a violation of well-settled law, a lack of substantial evidence, excessiveness and was undoubtedly tainted by the district court's prejudicial evidentiary rulings?

## STATEMENT OF THE CASE

### I. Gibbons Failed To Offer Evidence Of An Essential Element Of His FELA Claim.

#### A. Gibbons Was Not Aware Of Any Problems With The Bridge On The Date Of The Incident.

On December 9, 2012, Gibbons was working for Union Pacific near Caliente, Nevada. (10AER002201:1-8[1]). At approximately 6:00 a.m., Gibbons was driving a truck with a trailer attached and an excavator/trackhoe moving rock (or ballast) down the Caliente Canyon. (10AER002201:22-24; 10AER2204:21-10AER2205:3; 10AER2200:19-20). To complete his task, Gibbons crossed both a railroad crossing

---

[1] References to the Appellant's Excerpts of Record consist of the volume number followed by the Bates Stamp for the page and pin cites where applicable.

and a bridge. (10AER002283:16-25). Union Pacific trained Gibbons both on how to operate the equipment he was using on December 9, 2012 and on bridge worker safety. (10AER002279:19-25). Gibbons testified that his training was sufficient for his job and that he had received safety training on the morning of the incident. (10AER002280:3-5; 10AER002281:12-20).

When Gibbons participated in his safety training the morning of December 9, 2012 with his Union Pacific supervisor, Gibbons had the opportunity to discuss the safety aspects of the tasks that he would be performing that day, and at any time, Gibbons could have refused to complete his task. (10AER002282:8-12; 10AER002293:21-23). Union Pacific has workplace rules that allow its employees, including Gibbons, to decline a task or activity if the employee feels it is unsafe. (*Id.* at 21-23). Gibbons did not feel that the task he was to engage in was unsafe and because he did not feel that the task was unsafe, he did not decline the task as permitted under Union Pacific's workplace rules. (10AER002294:8-12).

Gibbons was alone in the truck on the morning of December 9, 2012. (10AER002205:8-9). As he was crossing the bridge at approximately five to ten miles per hour, Gibbons felt a jerk or a pull; his head did not hit anything, his body did not come into contact with anything that it was not already touching, nothing hit him, and his air bags did not deploy. (10AER002284:25-10AER002285:7; 10AER002218:5-17; 10AER002287:20-10AER002288:6). Gibbons realized that

5

the bridge had fallen, and he called his supervisor. (10AER002219:16-23). Gibbons did not need any assistance to exit the truck and once Gibbons' supervisor arrived, Gibbons helped to unload the excavator off the trailer. (10AER002220:5-8; 10AER002289:21-23).

Gibbons worked in this same area for the previous eight years prior to December 9, 2012. (10AER002290:25-10AER002291:2). And Gibbons had been working in the exact area for most of the winter in 2012. (10AER002291:8-13). Gibbons crossed the same bridge, which had the span of one car length and was put in place in 1963, routinely in his work for Union Pacific. (10AER002290:25-10AER002291:7; 10AER002295:22-24; 5AER000853:12-15). Gibbons regularly crossed the bridge that winter and regularly crossed the bridge in his dump truck loaded with rock with the trailer and the excavator. (10AER002291:19-22).

In the eight years that Gibbons worked in Caliente Canyon, he never had any problems crossing the bridge, and he worked there every winter for eight years prior to 2012. (10AER002292:3-5; 7AER001324:18-7AER001325:2). In fact, on December 8, 2012, the day before the incident, Gibbons crossed the bridge without any issue, performing the same tasks he performed on December 9, 2012. (10AER002292:15-19). Gibbons was not aware of anything different about the bridge on December 9, 2012 compared to the many other times he had crossed the

bridge. (*Id.* at 20-23). Gibbons had been in that area since December 1, 2012 and had been there every single day up until the incident. (7AER001326:8-16).

Importantly, Gibbons testified that on the day of the incident there was no way to know that the bridge was faulty before he had crossed it. (10AER002294:24-10AER002295:5). Gibbons further testified that he had never heard of a bridge such as the one he was crossing collapsing. (10AER002295:16-18). Gibbons did not hear any noises that would indicate that there was a problem with the bridge. (10AER002288:17-20). The first indication that there was any problem with the bridge was when Gibbons felt a jerk or pulling feeling. (*Id.* at 21-23).

     **B.**    <u>Union Pacific Did Not Learn Or Should Have Learned Of A Potential Hazard With The Bridge.</u>

           **1.**    <u>The Instruction To The Jury Contained The Correct Legal Standard That Union Pacific Is Only Liable If It Learned Or Should Have Learned Of A Hazard.</u>

Jury Instruction 28 made clear that Union Pacific would only be liable to Gibbons if Union Pacific "learns or should learn of a potential hazard." (3AER000510:13-15). Union Pacific's duty to provide a safe working environment applies *only* to "foreseeable dangers or risks." (*Id.* at 7-9).

In full, Jury Instruction 28 provided:

       An employer is not liable if it has no reasonable way of knowing that a potential hazard exists. An employer's duty to provide a safe working environment extends only to foreseeable dangers or risks. Thus, if an employer had no reasonable ground to anticipate that a

particular condition would or might result in a mishap or injury, then the employer is not negligent by failing to correct the condition. However, if an employer learns or should learn of a potential hazard, it must take reasonable steps to investigate and to inform and protect its employees, or it will be liable when injury occurs. If an employer's negligence is found, however, then the employer is responsible for damages even if the extent of the injury or the manner in which it occurred was not probable or foreseeable.

(*Id.* at 5-22). The testimony at trial made clear that Union Pacific did not learn, or should have learned, that the bridge would fail on December 9, 2012.

> 2. Through Randy Winn, Former Union Pacific Bridge Inspector, Gibbons Offered Evidence That Union Pacific Did *Not* Learn, Nor Should Have Learned Of A Hazard.

At trial, Gibbons called Randy Winn, the lead inspector of the bridge. (4AER000563:14-15; 4AER000570:10-13). Mr. Winn's job as a bridge inspector was to ensure the safe passage for trains, equipment and people. (4AER000569:5-10). His job responsibilities also included assessing the condition of bridges, including the bridge that was the subject of this action. (*Id.* at 11-13; 4AER000570:7-9).

Mr. Winn began working for Union Pacific in 1980 as a bridge laborer assisting in maintenance and the repair of bridges. (4AER000566:9-17). After a couple of years, Mr. Winn worked as a carpenter for railcar bridges and became a bridge welder and truck driver. (4AER000566:19-4AER000567:9). Mr. Winn then became a foreman and led a crew completing the maintenance and repair of bridges.

(4AER000567:15-21). For over 15 years, Mr. Winn was responsible for the construction and maintenance of railroad bridges and the safety of men and work procedures. (4AER000675:17-25). With respect to bridge construction, Mr. Winn did everything from the ground up, including driving pile, welding and just general construction of bridges. (4AER000676:4-9). In approximately 2004, Mr. Winn became a bridge inspector and remained in that position for close to 10 years. (4AER000568:6-10). In his duties as a bridge inspector, Mr. Winn has had occasion to remove a bridge from service because men and equipment could not safely pass over the bridge. (4AER000684:14-20).

Mr. Winn worked his entire career, except for a couple of weeks when he worked for the track equipment, in the bridge department. (4AER000677:3-8). Mr. Winn has 34 years of experience with Union Pacific's bridges. (*Id.* at 9-11). When Mr. Winn became a bridge inspector, he received on-the-job training and had biannual meetings wherein Union Pacific went over inspection procedures and safety rules. (*Id.* at 12-17). Mr. Winn also took classes from the American Railway Engineering and Maintenance-of-Way Association ("AREMA"), which suggests policies and procedures for railroads to follow as far as construction, engineering and maintenance practices. (4AER000677:21-4AER000678:4). The AREMA classes Mr. Winn took included detailed training on bridge inspection standards, including safety procedures and specific defects, for railroad bridges.

9

(4AER000678:7-15; 4AER000679:6-10). Importantly, AREMA's standards notes that the primary method of inspection for the type of bridge involved in the incident is *visual*. (4AER000688:11-14). Mr. Winn never had his AREMA certification revoked. (4AER000678:16-18).

Every year, Mr. Winn received training on the rules that applied to bridge inspection, which also required him to take and pass an exam. (4AER000681:1-11). Mr. Winn was qualified and trained to apply AREMA standards. (*Id.* at 17-19). And Mr. Winn was qualified and trained on how to apply railroad bridge standards to his work. (*Id.* at 20-22). Mr. Winn also held a Federal Railroad Act ("FRA") certification and followed the rules set forth by the FRA, which has jurisdiction over all railroad activities. (4AER000574:19-22; 4AER000681:23-4AER000682:1; 4AER000575:6-9). Mr. Winn's training included the factors that constituted a defect of railroad bridges. (4AER000682:11-15). Importantly, a sag is *not* considered a defect. (4AER000683:3-4).

Mr. Winn testified that it was his understanding that his inspection responsibilities, and thus Union Pacific's inspection responsibilities, included compliance with the FRA. (4AER000576:15-18). The bridge in question was in full compliance with the FRA. (*Id.* at 19-22). Mr. Winn testified that he and his assistant inspected the bridge twice yearly and that their inspection would take as long as needed to get the job done and to make sure that the vehicles and equipment

10

could pass over the bridge safely. (4AER000581:12-4AER000582:6; 4AER000584:22-4AER000585:1; 4AER000613:11-15).

Included in Union Pacific's twice-yearly inspection was to see if there was any noticeable sag; although, sagging is *not* considered a defect. (4AER000586:25-4AER000587:7; 4AER000683:3-4). Mr. Winn would not measure any sag on a bridge unless it was obvious that there was a problem and/or a defect that caused the sag. (4AER000587:15-20).

Mr. Winn's twice-yearly inspections included starting at one end of the bridge, either on top or underneath and looking at the entirety of the structure from one end to the other and going back across the bridge, again either from above or below and looking for problems. (4AER000581:12-16; 4AER000589:12-22). Mr. Winn inspected both the superstructure and substructure (the underneath) of the bridge. (4AER000640:10-13). Every time Mr. Winn inspected the bridge, he would inspect the underside of the bridge. (4AER000641:8-12). Union Pacific provided Mr. Winn with a "snooper truck," which had a crane with a basket to allow Mr. Winn to closely inspect the underside of the bridge. (4AER000643:2-9). As part of his inspection, Mr. Winn also looked for any breaks in the welds of sheet metal. (4AER000651:7-9). Mr. Winn looked for any bending or cracking of the metal and looked for any stress fractures. (4AER000640:21-4AER000641:2).

11

Prior to the incident, the last time Mr. Winn inspected the bridge was on October 9, 2012, exactly two months before the incident occurred. (4AER000595:1-5; 4AER000639:3-7). Mr. Winn did not notice anything that was of any significance with respect to the bridge. (4AER000595:6-9; 4AER000640:2-5). Mr. Winn noted that the bridge did not have any defects and was safe for the passage of vehicles, including dump trucks with ballasts. (4AER000614:21-4AER000615:4). Although Mr. Winn had been required to respond to special bridge inspections related to employee complaints, Mr. Winn never received any employee complaints or concerns about the bridge in question. (4AER000700:8-13). As testified to by Mr. Winn, the bridge's failure occurred on the main support beam on the underneath of the bridge – an area that he had just inspected two months prior and did not find any defects or anything of significance. (4AER000645:15-20; 4AER000595:6-9; 4AER000614:21-4AER000615:4; 4AER000640:2-5). In sum, Union Pacific did not previously identify any problems or dangerous conditions with the bridge and had no reason to know that there were any problems or defects with the bridge.

3. Through His Forensic Engineer Witness, Mark Burns, Gibbons Set Forth Additional Evidence To Support A Finding That Union Pacific Did Not Learn, Nor Should Have Learned About A Hazard.

Another of Gibbons' witnesses, Mark Burns, a forensic engineer from Australia, who is not a licensed engineer in the United States, provided testimony

that supported Mr. Winn and Union Pacific's inspection of the bridge. (5AER000822:19-23; 5AER000823:9-10; 5AER000927:7-9). Specifically, Mr. Burns testified and admitted that the United States Department of Transportation Federal Highway Administration's report issued in December 2012 entitled *Bridge Inspections* states that the primary method of bridge inspection is *visual*. (5AER000965:21-5AER000966:2). And, further, that the FRA rules do not require that a person inspecting bridges be a licensed engineer. (5AER000990:6-8).

In sum, Gibbons did not offer any evidence that Union Pacific either learned or should have learned of any hazard with the bridge. Instead, Union Pacific followed the rules and recommendations and inspected the bridge twice yearly, even inspecting the bridge for defects two months prior to the incident. Simply put, neither Gibbons, nor Union Pacific, learned or should have learned that the bridge's structural integrity was compromised prior to the incident.

## II.   The Evidence Presented Does Not Support The Jury's Awards For Gibbons' Damages.

### A.   Evidence Of Gibbons' Medical Complaints And Potential Future Medical Expenses Presented At Trial.

Dr. Scott Kimbrough specializes in forensics engineering, failure analysis and accident investigation, safety engineering, control system design, instrumentation and testing, electronic and mechanical system design and prototype fabrication and he testified as to the kinds of forces that was generated when the bridge the failed.

13

(3AER000322:3-10; 3AER000327:2-4). Dr. Kimbrough determined that Gibbons experienced a force typical of plopping in a chair, which would be less than the force experienced when jumping up and down vigorously. (3AER000339:1-8). Dr. Kimbrough further found that the perpendicular force that Gibbons experienced was similar to a bumper car collision at an amusement park. (*Id.* at 16-23). Dr. Kimbrough conducted his calculations using the most favorable scenarios and calculations to Gibbons. (3AER000416:25-3AER000417:4).

After the incident occurred, Gibbons did not immediately notice any pain. (A10ER002221:2-3). It was not until later on December 9, 2012 that Gibbons felt that his back was starting to get tight. (*Id*. at 4-8). Gibbons eventually went to the emergency room in Cedar City, Utah where the doctor ordered x-rays and ultimately discharged Gibbons prescribing Gibbons pain medication. (*Id.* at 22-25; 10AER002239:19-25; 10AER002124; 10AER002242:7-10). Several days later, Gibbons went to see Dr. Colledge in Utah. (10AER002242:14-21). At that time, on December 13, 2012, Gibbons noted that he was having back pain. (10AER002246:2-8; 10AER002166-2168). Gibbons admitted that he was not seeking any treatment for neck pain. (7AER001280:6-11). In fact, when Gibbons completed forms for Dr. Colledge, Gibbons did not identify that he was seeking treatment for neck pain. (7AER001279:13-24; 10AER002166; 10AER002242:11-18).

14

Dr. Colledge referred Gibbons to physical therapy to which Gibbons did not respond well. (10AER002250:7-11; 10AER002251:22-25). Dr. Colledge also restricted Gibbons' activities and recommended that Gibbons work at less than full duty. (10AER002252:19-24). In March 2013, Dr. Colledge, at Gibbons' request, released all restrictions on Gibbons and Gibbons went back to full work duty in March 2013. (10AER002253:7-22).

In June 2014, Gibbons went back to Dr. Colledge who recommended an antidepressant. (10AER002254:8-12; 10AER002255:9-14). In December 2014, Gibbons decided to see Dr. Sam Linford. (10AER002256:3-6). Dr. Linford ordered a magnetic resonance imaging of Gibbons' neck and ultimately referred Gibbons to see a doctor in Salt Lake City, Utah. (*Id.* at 13-25). In or around May or June 2015, Gibbons received epidural injections to assist with any pain that he might be experiencing. (10AER002257:2-12). Because Gibbons was tired of driving to Salt Lake City, he began to see Dr. Skene in Jackson Hole, Wyoming. (10AER002258:12-17). Eventually, Gibbons had surgery on or about February 25, 2016. (10AER002259:13-10AER002260:2). After surgery, Gibbons testified that he "felt way better. The pressure was gone…it felt way better. I was actually really relieved." (10AER002261:10-16). After about two months, Gibbons returned to work without restriction. (*Id.* at 17-23). Since his surgery, Gibbons has worked continuously. (10AER002262:1-3).

15

At trial, Union Pacific called Dr. Scott Knorpp as one of its witnesses. Dr. Knorpp regularly treats patients with neck and back injuries; injuries similar to the ones Gibbons alleged he experienced. (5AER001021:6:11). Dr. Knorpp also determines patients who are surgical candidates for surgery to the neck and/or back. (*Id.* at 12-18). Dr. Knorpp testified as to his firsthand knowledge of Gibbons' medical conditions based on both his physical examination of Gibbons and on his clinical interview with Gibbons. (5AER001011:22-25; 5AER001012:8-15). Dr. Knorpp testified that he conducted his evaluation of Gibbons on November 1, 2016 at which time Gibbons indicated a 70% improvement from the incident. (5AER001032:5-12). Based on his evaluation of Gibbons, the records he reviewed and medical literature, Dr. Knorpp testified that Gibbons' low back injury was a minor injury and that Gibbons did not suffer from a neck injury. (5AER001041:1-5; 5AER001043:12-14).

Dr. Knorpp further testified that he was unaware of any medical literature or physical findings that would suggest that any neck pain suffered by Gibbons was related to the incident. (5AER001048:18-23). Further, any headaches that Gibbons might have are not related to the incident. (5AER001051:23-25). Dr. Knorpp based his opinion on the International Headache Society's publication and the time frames associated with the cause of headaches. (5AER001052:1-13).

16

Dr. Knorpp also concluded, based upon a reasonable degree of medical probability, that Gibbons would not require any future medical care due to the incident. (5AER001064:6-11; 5AER001064:24-5AER001065:1). Importantly, Dr. Knorpp concluded that there is not any medical justification for limiting Gibbons in terms of his future work with Union Pacific because of the incident. (5AER001066:6-13). Dr. Knorpp also concluded that Gibbons will not need any additional surgery. (5AER001077:11-23).

Dr. Knorpp's expert opinion contradicted Gibbons' expert, Dr. Thomas Dunn. (7AER001365:12-13). Notably, Gibbons' expert, Dr. Dunn, never spoke to, much less physically examined, Gibbons prior to the issuance of his expert report on March 6, 2017. (6AER001159:10-14). And Dr. Dunn did not speak with any of Gibbons' treating physicians prior to issuing his March 6, 2017 report. (6AER001160:10-21). Dr. Dunn's review was strictly based on the records provided to him by Gibbons' counsel. (6AER001186:21-6AER001187:7). In fact, Dr. Dunn could not even accurately recall Gibbons' medical history, including that Gibbons had previously experienced a level three trauma event where he was emergency airlifted to a hospital. (6AER001195:21-25). Despite these failings, Dr. Dunn provided his opinion that Gibbons would more than likely need additional surgery. (6AER001144:24-6AER001145:17). Dr. Dunn testified that Gibbons' future medical charges would cost $132,237 for spinal surgery and $268,224 for lumbar

17

reconstruction surgery for a total of $400,461.00. (6AER001150:2-21). Dr. Dunn did not testify to, nor did Gibbons proffer, the present value of the $400,461.00. (6AER001162:3-5).

> **B.** **After The Incident, The Jury Learned Gibbons Continued To Work For Union Pacific And Was Still Working For Union Pacific At The Time Of Trial.**

Immediately after the incident, Gibbons continued to work for Union Pacific without restrictions. (5AER001063:3-17). Bert Bergstrom, a Union Pacific employee who was on the same shift with Gibbons on December 9, 2012, testified that he continuously worked with Gibbons from the date of the incident up until approximately April/May 2017. (4AER000752:11-15; 4AER000753:13-4AER000754:3; 4AER000751:6-9; 4AER000759:11-13). To Mr. Bergstrom's knowledge, Gibbons never missed work after the incident and continued to perform his work. (4AER000759:3-19). Mr. Bergstrom testified that Gibbons, up until Mr. Bergstrom stopped working with him in April/May 2017, was working full time, capable of performing his job duties and able to do anything that any other worker was doing. (4AER000760:2-7; 4AER000766:3-13). Gibbons never complained to Bergstrom that he could not do the work required. (4AER000767:1-4).

Dr. Knorpp agreed that Gibbons returning to work was medically appropriate and reasonable since it was the "most important part of a therapeutic treatment plan is to return someone to their productive employment, even if it's at modified duty,

as soon as reasonably possible." (5AER001063:18-24). In fact, there was no medical reason for Gibbons to not return to work. (5AER001063:25-5AER001064:1). Notably, Gibbons' proffered expert, Dr. Dunn, also acknowledged that Gibbons returned to work without restriction. (6AER001207:4-6). Dr. Dunn also admitted that neither he, nor anyone to his knowledge, recommended any restrictions on Gibbons for his job. (*Id.* at 7-12).

Gibbons also testified that, presently, he does not have any physical restrictions for work. (7AER001296:8-10). The only time Gibbons did not work was for about two months in 2016 after his surgery, after which he went back to work full-time without restriction. (10AER002259:24-10AER002260:2; 10AER002261:17-23). Gibbons testified that he has worked continuously from his return from surgery to the date he was in trial. (10AER002262:1-3). At trial, Gibbons stated that he still experiences some pain, but can control it through aspirin and Lyrica, (or nerve pain medication) which allows him to continue to work and operate heavy equipment. (10AER002269:12-16 and 23-25).

At the time of trial, Gibbons was 42 years old. (10AER002178:1). He began his employment with Union Pacific in 1997 and, at the time of trial, had 21 years of service with the Union Pacific. (7AER001296:11-12 and 17-19). Gibbons testified that his ideal retirement age is 60 or 18 years from the time of trial. (7AER001296:20-7AER001297:2). Should Gibbons retire at the age of 60, or in the

19

year 2036, Gibbons would be entitled for a full railroad retirement. (7AER001296:20-23). Based on Gibbons' own testimony, Gibbons would retire 18 years from 2018 at age 60. (7AER001296:20-7AER001297:2). Gibbons testified that he makes around $30.00 an hour with benefits, which equates to around $60,000.00-$70,000.00 a year. (10AER002269:2-5).

## III. Union Pacific Obtained Two Favorable Pretrial Rulings On Future Medical Damages And Work Life Capacity, Which Were Ignored At Trial.

### A. The Magistrate Judge Precluded Gibbons From Presenting An Expert Witness To Testify To Gibbons' Future Damages Reduced To Present Value.

After the close of discovery, Gibbons moved the district court to reopen discovery to disclose an expert economist:

> Specifically, it was determined Plaintiff will require additional medical treatment and his working life will be shortened due to the injuries sustained herein, and therefore, Plaintiff has definitive loss of earning capacity and future earnings, as well as future medicals, all owing to the nature and extent of his injuries. *Expert economist testimony is necessary to provide the jury with these damage amounts reduced to present value.*

(12AER002708:3-9) (emphasis added). Although Gibbons already had disclosed Dr. Dunn as a physician expert witness to opine as to Gibbons' injuries and future medical care, Gibbons recognized that Dr. Dunn was not qualified to reduce Gibbons' proposed future damages to present value, as required by law. (12AER002709:26-27; 27AER002710:1-16; 27AER002708:3-9). Gibbons argued

20

that he did not retain an economist, as required, because the parties were going to attend a settlement conference. (27AER002710:17-20).

In addition to requesting leave to disclose an economist, in his motion, Gibbons further set forth a supplemental report by Dr. Dunn and stated that Dr. Dunn would also opine that Gibbons' work life expectancy would be reduced by a period of five to ten years. (12AER002711:2-23). Gibbons recognized that if he is unable to proffer his future medical costs reduced to present value he would be "greatly, permanently and unfairly prejudice[d]." (12AER002713:4-9). Gibbons' understanding of the need for an economist to present his future medical costs discounted to present value cannot be understated: "[A]n economist who can opine regarding present value of future medical expenses and loss of earnings is *necessary*." (12AER002714:16-17) (emphasis added); (12AER002657:3-4) ("Expert economist testimony is necessary to provide the jury with these damage amounts reduced to present value.").

Importantly, Gibbons recognized that the failure to reduce his future damages to present value would likely result in a potential claim of speculation: "the designation merely provides the jury with a reasonable estimate of Plaintiff's future damages in present value, and avoids any potential claim of speculation, if raised by the defense." (12AER002660:23-25). In other words, Gibbons acknowledged that his proposed expert witness was required and necessary to have the jury avoid

21

speculation and for Gibbons to be awarded his future damages reduced to present value.

Gibbons' arguments as to why he disregarded the discovery deadlines did not persuade the Magistrate Judge. (11AER002649-52). The Magistrate Judge held:

> Under the circumstances of this case, where *Plaintiff was well aware of the need for future surgery and therefore the likelihood of future economic losses*, and accepting his argument that he did not disclose the expert because he thought the case would settle, it appears that Plaintiff made a strategic decision to not retain an expert. The Court is therefore not persuaded that the Plaintiff's failure to meet the deadline was substantially justified. Furthermore, the court finds that the late designation of Dr. Clauretie would be prejudicial to Defendant because it has not had the opportunity to defend against the future economic damages claim contained in the report, and trial is scheduled to begin within the month, leaving insufficient time to allow discovery by the defense.

(11AER002652:2-10) (emphasis added). The Magistrate Judge, therefore, precluded Gibbons from presenting evidence of future economic damages reduced to present value (the "Present Value Order"). (11AER002649-52).

B.  The District Court Judge Precluded Gibbons From Presenting Evidence Of Work Life Capacity Reduced To A Number.

During calendar call, Union Pacific raised a concern that Gibbons' physician expert, Dr. Dunn, would testify regarding future damages. (11AER002616:24-11AER002617:4). As support, Union Pacific relied on case law that prohibits a physician from giving opinions regarding future medical damages unless those damages can be reduced to present value, which had been precluded by the Present

22

Value Order. (11AER002617:11-16). Gibbons stated that it was expected that Dr. Dunn would testify that Gibbons' work life would be reduced by five to ten years. (11AER002618:1-6). In response, the district court expressed concern with Dr. Dunn providing an opinion that was outside of a treating physician's knowledge. (11AER002631:15-18). The district court stated that it was not convinced that Dr. Dunn could testify to the level of specificity as proposed by Gibbons. (11AER002632:25-11AER002633:5).

On April 20, 2018, Union Pacific filed a motion in limine to exclude evidence of Gibbons' future medical expenses and certain expert opinion by Dr. Dunn. (11AER002554-91). In sum, the motion in limine sought to exclude "any argument or evidence regarding Plaintiff's claimed future medical expenses on the grounds that such damages are speculative. In addition, it is requested that Dr. Dunn be precluded from offering any testimony that Plaintiff's work life expectancy is reduced by five (5) to ten (10) years." (11AER002554:23-26).

Although Gibbons' counsel was aware of the pending motion in limine and the district court's preliminary ruling and concern about presenting testimony to the jury about a reduced work life capacity, during his opening statement, Gibbons' counsel raised the issue of work life capacity:

> [Gibbons'] got another probably 25 years of work life ahead of him it he's able to make it. But the only thing he's trained to do is work on the railroad and the only type of job that he's specifically trained on

23

is how to operate heavy equipment. That's that. And so currently he makes about $70,000 a year doing that job earning about 40 bucks an hour when you add his pay and his benefits together. And so what happens to Greg Gibbons if he's not able to perform that job anymore.

(11AER002531:12-17).

Requesting a sidebar, Union Pacific's counsel attempted to enforce the very

subject of Union Pacific's motion in limine:

> Mr. Morris is attempting to present to the jury a work capacity – shortened work life capacity and we filed our Daubert motion as the Court recognized because he filed his emergency motion and insists our defense would be inappropriate so he could try to get it into the juror's mind that he has the usual work life capacity and he also tries to get numbers, the same thing.

(11AER002531:25-11AER002532:6).

In response, the district court confirmed its prior statement that Dr. Dunn did

not have the background or experience to give an opinion as to a shortened work

life, but that Dr. Dunn could testify about future medical care that might be

necessary. (11AER002532:9-14). The Court ruled that there was no basis for any

evidence to be presented to the jury that Gibbons' work life is going to be shortened

by five to ten years. (11AER002533:9-13). The Court further stated that the

discussion of Gibbons losing his job and not being able to make his wage is

speculative. (11AER002534:18-24). The Court instructed Gibbons' counsel to stay

away from the issue of Gibbons work life capacity until the Court could determine

24

whether Gibbons would be able to introduce that evidence before the jury. (11AER002535:2-6).

On the third day of trial, the district court ruled on Union Pacific's motion in limine holding that Dr. Dunn could explain about future medical care, including whether the course of treatment was proper, "[b]ut as to that specific opinion of work life capacity actually being reduced by a number as opposed to just generally, there will likely be a reduction in work life capacity, that's really the portion that causes me some concern." (7AER001352:17-7AER001353:2). The district court recognized that case law holds that a plaintiff may only recover for lost earning capacity if the plaintiff produces "competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him, and the plaintiff must show that his injury has caused a diminution in his ability to earn a living." (7AER001352:1-6). Further, the district court noted that "there's a preference for these issues to be resolved by the jury with a proper instruction." (*Id.* at 6-8).

Ultimately, the district court granted in part and denied in part Union Pacific's motion in limine (the "Work Life Capacity Order"): "[Dr. Dunn] does have the experience to testify as to future medical issues that plaintiff may face and that accompany physical restrictions, but he is not qualified to say how this will affect plaintiff's work life specifically a reduction of five to ten years." (7AER001356:3-

25

12). The district court determined that Dr. Dunn is not qualified to say how Gibbons' future medical issues that Gibbons may face "will affect plaintiff's work life specifically a reduction of five to ten years" as that testimony would be "speculative." (*Id.* at 8-14).

### C. However, The District Court Allowed Gibbons To Violate The Evidentiary Rulings At Trial.

During Dr. Dunn's testimony, Dr. Dunn not only testified as to his opinion on Gibbons' future medical care, but he provided specific dollar amounts for the potential surgery; contrary to the Present Value Order. Specifically, Dr. Dunn testified that Gibbons' future medical charges would cost $132,237.00 for spinal surgery and $268,224.00 for lumbar reconstruction surgery for a total of $400,461.00. (6AER001150:2-21). The $400,461.00 amount provided by Dr. Dunn was *not* the present value of the future medical care and Dr. Dunn's testimony went beyond the scope of the Present Value Order. (6AER001162:3-5).

In addition, in Gibbons' closing argument, Gibbons' counsel consistently violated the Work Life Capacity Order by referencing the prohibited "five years" or "ten years" in the context of the time frame by which Gibbons would need to return to ask for additional damages:

> We don't come back in *ten years* and say there's been another surgery, there's been other job performance issue, *all those have to be presented and forecasted to you with the experts and what the medical*

26

*records and other things predict to you as best we can without having a crystal ball.*

\*       \*       \*

As Mr. Coon mentioned to you, this is Mr. Gibbons' only day in court. *We don't get to come back in five years and say, well, now he's had another surgery, we would like to talk to you about some additional damages. It doesn't work that way. We can't come back in 10 or 15 years and resubmit his case.*

(2AER000131:5-13; 2AER000134:19-25) (emphasis added).

Gibbons' counsel went so far as to ask the jury to give consideration "*regarding lost wages, and that's another 23 years of work. If that work life were cut short by ten years, then the amount be $700,000….*" (2AER000174:5-8) (emphasis added). Over Union Pacific's objection, the district court allowed Gibbons' counsel to violate the Work Life Capacity Order and argue for a specific number of years that Gibbons' counsel speculated Gibbons would be unable to work. (*Id.* at 5-15).

## IV.    The District Court Denies Union Pacific's Post-Judgment Motion.

On May 8, 2018, the district court entered the jury verdict as follows:

(a) Lost wages and benefits in the future
(reduced to present value):                                     $1,500,000

(b) Medical and hospital expenses likely to
be incurred in the future (reduced to present value):    $500,000

(c) Mental and emotional humiliation or pain and
anguish:                                                                      $1,500,000

27

(d) Physical pain and suffering:                    $1,500,000

(1AER000010).

On June 4, 2018, Union Pacific filed its timely Motion to Alter or Amend the Judgment Pursuant to FRCP 59(e); and Motion for New Trial or, in the Alternative for Remittitur Pursuant to FRCP 59(a). (2AER00053-67). In brief, Union Pacific identified Gibbons' failure to present admissible evidence at trial of an element of his negligence claim and set forth the legal errors of the jury's damages award. On March 25, 2019, the district court denied Union Pacific's Motion. (1AER000001-9).

## SUMMARY OF THE ARGUMENT

Precedent is clear that a FELA plaintiff must establish that his employer learned or should have learned of the potential hazard in question. Here, Union Pacific took all reasonable steps within the industry standard of care as required by AREMA and the FRA to inspect its bridges. Thus, the clear weight of the evidence demonstrates that Gibbons did not meet his burden of proof and failed to show that Union Pacific learned or should have learned that the bridge would collapse on December 9, 2012.

In addition, the damages awarded by the jury to Gibbons each suffer from legal error. The jury (i) did not discount Gibbons' damages for Future Medical Costs and awarded excessive damages; (ii) awarded Gibbons excessive Lost Wages based

on speculation; and (iii) awarded Gibbons damages for Pain and Suffering despite there being a lack of substantial evidence to base such an award. Moreover, the district court contributed to the improper damages award by failing to enforce evidentiary rulings, which resulted in prejudice to Union Pacific, as evidenced by the amount of the damages.

The district court's decision to deny Union Pacific's Motion is erroneous where Gibbons did not prove a necessary element of his sole claim for negligence and where the awarded damages were a product of prejudicial evidentiary rulings, against the clear weight of the evidence and in error.

## ARGUMENT

## I.   Legal Standard Of Review.

A.   The Court Reviews A District Court's Denial Of A Motion For A New Trial And/Or Motion To Alter Or Amend The Judgment For An Abuse Of Discretion.

Rule 59(a)(1) of the Federal Rules of Civil Procedure provides authority to a court to grant a party's motion for new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FRCP 59(a)(1). These reasons include "a verdict [that] is contrary to the clear weight of the evidence, a verdict based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Crowley v. Epicept Corp.*, 883 F.3d 739, 748 (9th Cir. 2018); *see also Bankcard America, Inc. v. Universal Bancard Systems, Inc.*, 203 F.3d 477,

480 (7th Cir. 2000) (A new trial must be granted if the verdict is against the weight of the evidence of if a prejudicial error occurred.).

In reviewing a verdict that is contrary to the clear weight of the evidence, the district court need not view the trial evidence in the light most favorable to the verdict. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). Instead, the district court is required to "set aside the verdict of the jury, even though supported by substantial evidence, where, in [its] conscientious opinion, the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent. . .a miscarriage of justice." *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957).

To prevent a miscarriage of justice, the district court should grant a new trial under Rule 59 "on any ground necessary." *Experience Hendrix L.L.C.*, 762 F.3d at 845-6. This includes granting a new trial when the damages awards are against the clear weight of the evidence or "the product of *speculation, error, and [a] disregard of the Court's instructions.*" *Id.* at 846 (internal quotations omitted) (emphasis added). A jury's verdict, including its damages award, must only be upheld if it is supported by "substantial evidence." *Sharp Structural, Inc. v. Franklin Mfg., Inc.*, 283 Fed.Appx. 585, 588 (9th Cir. 2008). And this Court must reverse a district court under the abuse of discretion standard "when the district court reaches a result that

30

is illogical, implausible, or without support in the inferences that may be drawn from the record." *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010).

In addition, Rule 59(e) of the Federal Rules of Civil Procedure affords a court the opportunity to alter or amend a judgment. FRCP 59(e). While the rules do not specify the bases upon which a Rule 59(e) motion may be granted, generally, there are four grounds on which a Rule 59(e) may be granted:

> (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law.

*Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). This Court reviews the district court's denial of a Rule 59(e) motion for an abuse of discretion. *Sharp Structural, Inc.,* 283 Fed.Appx. at 588.

Alternatively, and with respect to an award of excessive damages, a court may deny a motion for a new trial conditioned upon the prevailing party accepting a remittitur, which the court considers justified. *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983).

B.    <u>The Court Reviews A District Court's Evidentiary Rulings For An Abuse Of Discretion</u>.

A district court's evidentiary rulings, including rulings to allow or exclude expert testimony and to permit counsel to make certain arguments in closing, is

31

reviewed for an abuse of discretion and includes a showing of prejudice. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 859 (9th Cir. 2014); *Cobb v. Rodriguez*, 751 Fed.Appx. 988, 990 (9th Cir. 2018); *Affiliated Mfrs., Inc. v. Aluminum Co. of America*, 56 F.3d 521, 525 (3rd Cir. 1995) ("Abuse of discretion is the standard of review for denial of a request for a new trial based on the district court's alleged error in ruling on the admissibility of evidence.") (internal citations omitted). An error in the district court's ruling on evidence is a ground for granting a new trial when the ruling substantially affects a party's right. *Beachy v. Boise Cascade Corp.*, 191 F.3d 1010, 1015-16 (9th Cir. 1999).

## II. The District Court Abused Its Discretion When It Denied Union Pacific's Post-Judgment Motion Because Gibbons Did Not Prove An Essential Element Of His FELA Claim – That Union Pacific Learned Or Should Have Learned That The Bridge Would Fail.

Liability under a negligence cause of action brought pursuant to FELA only attaches to an employer if the employer "learns or should learn of a potential hazard" and failed to take reasonable steps to investigate and inform and protect its employees. *Gallose v. Long Island R. Co.*, 878 F.2d 80, 85 (2nd Cir. 1989). An employer is not liable under FELA if it had no reasonable way of knowing that a hazard exists because "FELA was never intended to hold an employer absolutely liable for workplace injuries." *Id.* Jury Instruction 28 set forth this controlling precedent: "An employer is not liable if it has no reasonable way of knowing that a

32

potential hazard exists…if an employer learns or should learn of a potential hazard, it must take reasonable steps to investigate and to inform and protect its employees, or it will be liable when injury occurs." (3AER000510:5-22).

Whether a party learned or should have learned of a potential hazard requires an examination of the relevant standard of care within the industry and whether the party's conduct fell below that standard of care. *CSX Transp., Inc. v. McBride*, 131 S.Ct. 2630, 2643, 564 U.S. 685, 703 (2011). "[R]easonable foreseeability of harm. . .is indeed and essential ingredient of [FELA] negligence." *Id.* (internal citations and quotations omitted). "The jury, therefore, must be asked initially: Did the carrier fai[l] to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances[?]" *Id.* (internal citations and quotations omitted).

At trial, Gibbons failed to prove that Union Pacific did not meet the industry standard of care in its inspections and thus that Union Pacific learned or should have learned about the hazard. Regardless, in its Order, the district court emphasized the "should learn" portion of the instruction and found that there was sufficient evidence for a juror to find that Union Pacific should have learned of the hazard. (1AER000004:3-6). The district court relied on (i) Mr. Winn's testimony "as to the limited nature of the [Union Pacific's] bridge inspections; (ii) photographs that show a sag in the bridge; and (iii) Mr. Burns testimony regarding the structural integrity

33

of the bridge. (*Id.* at 7-11). However, the clear weight of the evidence demonstrates that each of the district court's reasons weighed *against* a finding that Union Pacific learned or should have learned that the bridge would collapse.

Mr. Winn, the Union Pacific bridge inspector, testified that he inspected the bridge twice yearly, conducting the most recent inspection on October 9, 2012, exactly two months before the incident. (4AER000595:1-5; 4AER000639:3-7). Mr. Winn's testimony confirmed that Union Pacific conducted the required amount of inspections on the bridge in question and that the primary method of inspection for the bridge as recommended by AREMA was a visual inspection. (4AER000581:10-21; 4AER000688:11-14). Mr. Winn further testified that his inspection would take as long as needed to get the job done to ensure that the bridge was safe. (4AER000581:12-16; 4AER000581:23-4AER000582:6; 4AER000584:22-4AER000585:1; 4AER000613:11-15). Mr. Winn inspected both the superstructure and substructure of the bridge, looking for any breaks in the welds of sheet metal and inspecting the bridge for any bending or cracking of the metal and looking for stress fractures. (4AER000640:10-13; 4AER000641:8-12; 4AER000643:2-9; 4AER000651:7-9; 4AER000695:21-4AER000696:2). Contrary to the district court's representation of Mr. Winn's testimony, Mr. Winn did not testify as to the limited nature of Union Pacific's inspections, but instead testified that Union Pacific strictly followed the industry standards set forth by AREMA and the FRA.

34

(4AER000678:7-15; 4AER000679:6-10; 4AER000688:11-14; 4AER000681:17-4AER000682:1; 4AER000576:15-18).

Union Pacific was required to visually inspect the bridge, which it did and to note and correct defects, which it did. Based on Mr. Winn's testimony, a reasonable juror could not conclude that Union Pacific failed to meet the standard of care within the industry and that it learned or should have learned that the bridge was a hazard.

In addition, the photographs that show the bridge sagging also could not support the jury's conclusion since a sag is not a defect. (4AER000683:3-4). And Mr. Winn specifically testified that a sag is not considered a defect under the rules set forth by the FRA. (4AER000682:11-15; 4AER000683:3-4).

Finally, the district court's reliance on Mr. Burns' testimony is misplaced. The district court referenced Mr. Burns testimony as to the bridge's load-bearing capacity and integrity of the bridge; however, that is not the inquiry. (1AER000004:7-8). The question Gibbons had to prove is whether Union Pacific learned or should have learned of the hazard under the auspices of the industry standard of care. And even Mr. Burns, Gibbons' own expert, confirmed that the primary method to inspect the type of bridge in question was visual. (5AER000965:21-5AER000966:2). Mr. Burns also confirmed that the FRA rules does not require that a person inspecting bridges be a licensed engineer. (5AER000990:6-8).

35

The record simply does not contain any evidence that Gibbons proved that Union Pacific learned or should have learned that the bridge would collapse on December 9, 2012. To the contrary, the weight of the evidence demonstrated that Union Pacific took all necessary and required steps to inspect the bridge in question and to ensure the safety of the bridge for its employees. The district court's finding that Union Pacific learned or should have learned about the hazard is not even supported by the evidence it cites in its Order, much less the record. Because the district court reached a result that is illogical and without support in the inferences that may be drawn from the record, Union Pacific asks this Court to reverse the district court and grant it a new trial.

**III. Because Each And Every Category Of Damages Awarded By The Jury Violates Well-Established Law And/Or Is Against The Clear Weight Of Evidence, The District Court Abused Its Discretion In Denying Union Pacific's Post-Judgment Motion.**

A.   The District Court Erred In Allowing Gibbons' Expert To Testify On Future Medical Damages Without Discounting For Present Value.

The district court erred in allowing Gibbons' expert to testify regarding Gibbons' future medical costs when it knew that Gibbons was unable to reduce the amount to present value. It is well-settled that future economic awards in suits governed by federal law, including FELA cases, must be based on present value. *Monessen Southwestern Ry. Co. v. Morgan*, 108 S.Ct. 1837, 1844, 486 U.S. 330, 339 (1988). And a district court's failure to adequately instruct the jury that present

36

value is the proper measure of damages is error.  *Id.* at 1845, 486 U.S. at 340.  Here, the district court erred in allowing evidence of Gibbons' future medical damages that were not discounted to present value.

Proving this, pre-trial, Gibbons recognized that he needed an economics expert to reduce any future medical damages to the present value.  (12AER002707-47).  Because the Magistrate Judge found that Gibbons made a strategic decision not to retain an expert until after the close of discovery and that Union Pacific would be prejudiced if Gibbons introduced such evidence, the Magistrate Judge denied Gibbons' motion to reopen discovery to disclose an economics expert and precluded Gibbons from presenting evidence of future medical damages reduced to present value.  (11AER002649-52). Despite this, the district court allowed Gibbons' medical expert to testify regarding the cost of future surgeries, which clearly confused the jury. (6AER001150:2-21).

Compounding its error, the district court allowed Gibbons' counsel to use the verdict form to argue that the "present value" of Gibbons' future medical and hospital expenses was $400,461.00 – the precise amount Dr. Dunn proffered. (2AER000049-51).  Specifically, during closing argument, Gibbons' counsel demonstrated to the jury how it should fill out the verdict form.  (2AER000169:4-2AER000179:20).  For "[m]edical and hospital expenses likely to be incurred in the future *(reduced to present value)*" Gibbons' counsel wrote $400,461.00.

(2AER000049-51; 2AER000175:15-24) (emphasis in original). Gibbons' counsel did not clarify that the number needed to be reduced to its present value; instead, he implied that the $400,461.00 *was* the present value. This was an error that prejudiced Union Pacific because it led to an excessive verdict amount. *Ollier*, 768 F.3d at 859; *Beachy*, 191 F.3d at 1015-16; *see also St. Louis Southwestern Ry. Co. v. Dickerson*, 105 S.Ct. 1347, 1349, 470 U.S. 409, 412 (1985) (stating that the failure to reduce awards to present value would risk overcompensating plaintiffs).

Reducing the $400,461.00 to present value, which the jury did not do, would be *less than* $400,461.00. *See Monessen Southwestern Ry. Co.*, 108 S.Ct. 1837 at 1846, 486 U.S. 330 at 342 (future damages are *discounted* to present value). Because the jury awarded Gibbons $500,000.00 based on evidence that *future* medical damages totaled $400,461.00, it is apparent that the award is excessive.

Moreover, even setting the failure to discount for present value aside, the jury's award was patently excessive. Again, Dr. Dunn testified that future medical costs totaled $400,461.00. (6AER001150:2-21). Thus, an award for $500,000.00 is against the weight of the evidence and excessive.

/ / /

/ / /

/ / /

38

B.  <u>The District Court Erred In Allowing Closing Argument On Gibbons'
    Work Life Capacity, Which Was Based Solely On Speculation, And
    The Evidence Presented Proved That Gibbons Would Not Suffer Any
    Future Lost Wages Or Benefits.</u>

A FELA plaintiff may only "recover a verdict for future lost earning capacity

if he has produced competent evidence suggesting that his injuries have narrowed

the range of economic opportunities available to him." *Gorniak v. National R.R.*

*Passenger Corp.*, 889 F.2d 481, 484 (9th Cir. 1989).  In other words, damages for

future lost wages and benefits cannot be based on speculation; instead, a "plaintiff

must show that his injury has caused a diminution in his ability to earn a living." *Id.*;

*see also Experience Hendrix L.L.C.*, 762 F.3d at 846.  Here, the district court erred

in allowing Gibbons' counsel to argue that Gibbons had a specific number of years

in which he would be unable to work when it knew that such argument was based

on speculation.

Pre-trial, Union Pacific filed a motion in limine to preclude Gibbons from

presenting expert testimony on Gibbons' alleged work life capacity arguing that

Gibbons' expert was not qualified to present such testimony.  (11AER002554-91).

The district court agreed finding that Gibbons' expert was not qualified to "say how

[future medical issues or physical restrictions] will affect plaintiff's work life

specifically a reduction of five to ten years." (7AER001356:8-14).  The district court

held that such testimony would be based on speculation.  (*Id.* at 8-14).  Despite this

ruling, the district court allowed Gibbons' counsel to repeatedly argue to the jury that Gibbons' work life capacity would be reduced five to ten years. (2AER000120:5-13; 2AER000168:19-25; 2AER000174:5-8) ("If that work life were cut short by ten years…."). The district court's failure to prohibit unsupported, speculative damages prejudiced Union Pacific as evidenced by the jury's award of $1,500,000.00 for Lost Wages. (1AER000010).

Further underscoring the fact that the jury's award was based on speculation is Gibbons' failure to present any evidence to support the jury's award of $1,500,000.00 for Lost Wages. Instead, the overwhelming evidence presented at trial demonstrated that Gibbons continues to work without restriction. (10AER002269:12-16 and 23-25; 7AER001296:8-10; 6AER001207:4-12). Indeed, even Gibbons' expert, Dr. Dunn, testified that Gibbons returned to work without restrictions and that neither he, nor anyone else to his knowledge, recommended any restrictions for Gibbons. (6AER001207:4-12). And Gibbons admitted that he can operate heavy equipment and work without restriction. (10AER002269:12-16 and 23-25). Moreover, Gibbons merely speculated that he is not guaranteed a job for life. (7AER001310:23-7AER001311:7). However, this type of speculation is not enough to support the jury's $1,500,000.00 award for Lost Wages.

Finally, and setting the district court's error in allowing Gibbons' counsel to argue an unsupported number of years for Gibbons' work life capacity aside, using

40

the $700,000.00 figure requested by Gibbons' counsel underscores that the $1,500,000.00 is not only based on speculation but is excessive. Clearly, the jury's $1,500,000.00 award in Lost Wages far exceeds Gibbons' own ask for $700,000.00. (2AER000174:5-8).

It is without question that Gibbons did not produce "competent evidence. . . that his injuries have narrowed the range of economic opportunities available to him" and that he failed to "show that his injury has caused a diminution in his ability to earn a living." *Gorniak*, 889 F.2d at 484. Put simply, the jury's award for $1,500,000.00 in Lost Wages is excessive and based on speculation.[2]

C.  The Jury's Award for Pain And Suffering Is Against The Clear Weight Of The Evidence And Excessive.

Gibbons did not set forth substantial evidence to support the jury's $3,000,000.00 award for Pain and Suffering. *Sharp Structural, Inc.,* 283 Fed.Appx. at 588. Specifically, nowhere in the record is there any evidence that Gibbons suffered any mental or emotional humiliation. Further, Gibbons testified that while

---

[2]  In addition, the District Court should have granted Union Pacific's Motion because it is apparent that the jury's $1,500,000.00 award is not the present value of Lost Wages, which is required in FELA actions. *See Monessen Southwestern Ry. Co.,* 108 S.Ct. at 1844, 486 U.S. at 339. And, moreover, the jury's award is not limited to Gibbons' net wages after deductions. *See Norfolk & W. Ry. Co. v. Liepelt,* 100 S.Ct. 755, 444 U.S. 490 (1980) (holding that the proper measure of damages in a FELA action is after-tax income losses, not gross wages); *see also* Jury Instruction 35. (3AER000514:25-3AER000515:3). Gibbons testified that he makes "[$]60, [$]70,000 a year;" accordingly, the jury did not award Gibbons his after-tax income losses, which required the district court to grant Union Pacific's Motion.

41

he might experience some pain, he is able to control it with aspirin or Lyrica. (AER002269:12-16 and 23-25). *See Longoria v. Hunter Express, Limited*, 932 F.3d 360, 366 (9th Cir. 2019) (finding an award of $1 million for physical pain too high where the plaintiff could manage his pain with an hour of stretching and warming up every morning and afternoon and take ibuprofen). Accordingly, the lack of substantial evidence to support the jury's $3,000,000.00 belies any argument that the award is supported by the clear weight of the evidence as suggested by the district court. (1AER000008:10-11).

In denying Union Pacific's Motion, the district court relied on Dr. Dunn's testimony regarding the potential future surgery Gibbons may undergo and Gibbons' herniations cause by the bridge collapse. (*Id.* at 11-15). However, the jury already awarded Gibbons his future medical costs as well as lost wages and benefits. (1AER000010). To use the same reasoning to justify multiple awards acts as overcompensation to Gibbons. *See Neill v. Diamond M. Drilling Co.,* 426 F.2d 487, 492 (5th Cir. 1970) (finding that the award of damages for "loss of physical capacity other than his capacity to earn wages overlaps with damages for lost wages and earning capacity and/or past and future physical pain and mental anguish") (internal citations omitted). !

The district court also relied on Dr. Dunn's testimony that Gibbons would suffer various limitations related to his job responsibilities. (1AER000008:15-18).

42

However, the substantial evidence presented firmly established that Gibbons has worked continuously outside of the two months he needed to recover from surgery, was working at the time of trial and did not have any restrictions placed on him. (10AER002259:24-10AER002260:2; 10AER002261:17-23; 7AER001296:8-10; 5AER001063:3-5AER001064:1; 4AER000752:11-15; 4AER000753:13-4AER000754:3; 4AER000751:6-9; 4AER000759:3-19; 4AER00760:2-7; 4AER000766:3-13; 4AER000767:1-4). In sum, the jury's collective damages award of $3,000,000.00 for mental and emotional humiliation or pain and anguish and for physical pain and suffering is not supported by "substantial evidence" and the district court erred in denying Union Pacific's Motion.

## CONCLUSION

The district court erred in denying Union Pacific's Motion. Gibbons did not prove an essential element of his claim, which mandated the district court alter or amend the judgment or grant Union Pacific a new trial. The district court also erred in denying Union Pacific's Motion because the damages the jury awarded Gibbons were against the clear weight of the evidence and in violation of settled law.

/ / /

/ / /

/ / /

/ / /

Consequently, Union Pacific respectfully requests that this Court reverse the district court's denial of Union Pacific's Motion to Alter or Amend the Judgment Pursuant to FRCP 59(e); and Motion for New Trial or, in the alternative, for Remittitur Pursuant to FRCP 59(a) and grant Union Pacific a new trial.

Date: August 30, 2019

McDONALD CARANO LLP

*/s/ Pat Lundvall*
Pat Lundvall, Nev. Bar No. 3761
Amanda C. Yen, Nev. Bar No. 9726
2300 W. Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
lundvall@mcdonaldcarano.com
ayen@mcdonaldcarano.com

*Attorneys for Defendant/Appellant Union Pacific Railroad Company*

44

## STATEMENT OF RELATED CASES

The undersigned hereby certifies that she is not aware of any related cases in this Court.

Date:  August 30, 2019

McDONALD CARANO LLP

*/s/  Pat Lundvall*
Pat Lundvall, Nev. Bar No. 3761
Amanda C. Yen, Nev. Bar No. 9726
2300 W. Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
lundvall@mcdonaldcarano.com
ayen@mcdonaldcarano.com

*Attorneys for Defendant/Appellant Union*
*Pacific Railroad Company*

45

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,979 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Times New Roman 14-point font.

Date:  August 30, 2019

McDONALD CARANO LLP

*/s/  Pat Lundvall*
Pat Lundvall, Nev. Bar No. 3761
Amanda C. Yen, Nev. Bar No. 9726
2300 W. Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
lundvall@mcdonaldcarano.com
ayen@mcdonaldcarano.com

*Attorneys for Defendant/Appellant Union Pacific Railroad Company*

46

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: August 30, 2019

McDONALD CARANO LLP

*/s/ Pat Lundvall*
Pat Lundvall, Nev. Bar No. 3761
Amanda C. Yen, Nev. Bar No. 9726
2300 W. Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
lundvall@mcdonaldcarano.com
ayen@mcdonaldcarano.com

*Attorneys for Defendant/Appellant Union Pacific Railroad Company*

4814-0275-8558, v. 6

47