No. 19-15839

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GREG GIBBONS,
*Plaintiff/Appellee,*

v.

UNION PACIFIC RAILROAD COMPANY
*Defendant/Appellant.*

On Appeal from the United States District Court
for the District of Nevada
No. 2:15-cv-02231-GMN-CWH
Hon. Gloria M. Navarro

## PLAINTIFF/APPELLEE'S ANSWERING BRIEF

James A. Morris, Jr. (Pro Hac Vice, CA Bar No. 296852)
Brent W. Coon (Pro Hac Vice)
BRENT COON & ASSOCIATES
4111 W. Alameda Avenue, Suite 611
Burbank, CA 91505
Telephone: (747) 283-1144
*jim.morris@bcoonlaw.com*
*brent@bcoonlaw.com*

Peter C. Wetherall (NV Bar No. 4414)
WETHERALL GROUP, LTD.
9345 West Sunset Road, Suite 100
Las Vegas, NV 89148
Telephone: (702) 838-8500
*pwetherall@wetherallgroup.com*

*Attorneys for Plaintiff/Appellee Greg Gibbons*

# TABLE OF CONTENTS

TABLE OF CONTENTS………………….………....………..    i

TABLE OF AUTHORITIES……………….…………....……….    v

INTRODUCTION…………………………………….…....…...    1

STATEMENT OF THE CASE………………………….….…....    3

   I.    Gibbons Proved His FELA Claim Against Union Pacific….    3

       A.    Union Pacific Failed To Provide Gibbons A Safe Place To Work………..…………………………..    3

       B.    Union Pacific Should Have Learned Of A Potential Hazard With Its Homemade Railroad Flatcar Bridge..    4

   II.    The Evidence Presented Supports the Jury's Awards For Gibbons' Damages………………………………….…...    10

   III.    The Evidence Presented At Trial Did Not Violate Any Pretrial Rulings……………..……………………………...    17

       A.    Gibbons Was Precluded From Presenting An Economist Expert At Trial And Gibbons Did Not Present An Economist Expert At Trial……….……..    17

       B.    Gibbons Was Precluded From Eliciting Testimony From Dr. Dunn At Trial That Gibbons Would Lose Five to Ten Years Of Work Life And Gibbons Did Not Elicit Testimony From Dr. Dunn At Trial That Gibbons Would Lose Five To Ten Years Of Work Life……………………………………………….    20

       C.    Gibbons' Counsel Was Not Limited At Trial In Arguing Work Life Capacity Reduction, But Even If He Was, Gibbons' Counsel Still Did Not Violate Any

Evidentiary Rulings Regarding Work Life Capacity……………………………………….. 23

SUMMARY OF THE ARGUMENT……………………………......…. 26

ARGUMENT……………………………………………….……......… 28

I. STANDARD OF REVIEW…………………….....………... 28

    A. The Reviewing Court Considers The District Court's Denial Of A FRCP Rule 59 Motion For New Trial And/Or Motion To Alter Or Amend Judgment And/Or Remittitur For Abuse Of Discretion……….. 28

    B. The Reviewing Court Considers The District Court's Evidentiary Rulings For Abuse Of Discretion……... 31

II. The District Court Did Not Abuse Its Discretion By Denying Union Pacific's Post-Judgment Motions, Because Gibbons Proved His FELA Claim, Including "Foreseeability"……….... 31

III. The District Court Did Not Abuse Its Discretion By Upholding Damages Awarded By The Jury……………….....………….. 36

    A. Under 9th Circuit Authority, Gibbons' Expert Was Not Required To Discount Future Medical Damages To Present Value, As Evidence Of Present Value Was To Be Offered, If At All, By Union Pacific………………………………………….... 36

        1. Union Pacific Was Not Prejudiced By The Jury's Award Of $500,000.00 For Future Medical Damages…………………………… 39

        2. The Jury's Award of $500,000.00 For Future Medical Damages Is Not Excessive…………. 41

B.  The District Court Properly Allowed Gibbons' Expert To Testify Regarding Future Medical Damages And Lost Earning Capacity……………………………….…    43

C.  The District Court Properly Permitted Gibbons Counsel To Include Closing Argument Regarding Lost Earning Capacity…….………………………...    45

D.  The Jury's Award For Pain And Suffering Is Neither Against The Clear Weight of The Evidence Nor Excessive………………………………………….…...    52

E.  A Remittitur Is Not Appropriate…………………....    58

CONCLUSION………………………………………………….…....    59

iv

# TABLE OF AUTHORITIES

## **Cases**

*Ahlf v. CSX Transp., Inc.,* 386 F.Supp.2d 83 (N.D. N.Y. 2005)……….. 55

*Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33 (1980)……………… 28

*Alma v. Manufacturers Hanover Trust Co.*, 684 F.2d 622 (9th Cir. 1982)……………………………………………………. 36, 37, 39

*Beachy v. Boise Cascade Corp.,* 191 F.3d 1010 (9th Cir. 1999)……….. 42, 43

*Better Building Maintenance of the Virgin Islands, Inc. v. Lee*, 60 V.I. 740  (2014)…………………………………………………. 19

*Chalmers v. City of Los Angeles*, 762 F.2d 753 (9th Cir. 1985)……….. 57

*Chicago, Rock Island & Pac. R. Co. v. Melcher,* 333 F.2d 996 (8th Cir. 1964)……………………………………………….. 29

*Colyer v. Consol. Rail Corp.,* 114 F.App'x 473 (3rd Cir. 2004)……….. 48

*Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103 (9th Cir. 1991)……………………………………………………. 48

*CSX Transp. Inc., v. McBride,* 131 S.Ct. 2630 (2011)……………….. 32, 33

*DeBiasio v. Illinois Cent. R.R.,* 52 F.3d 678 (7th Cir. 1995)…………… 55

*Del Monte Dunes at Monterey, Ltd. v. Monterey*, 95 F.3d 1422 (9th Cir. 1996)……………………………………………………. 30

*Dickerson v. Norfolk & W. Ry. Co.,* No. 87-C-153 (Brooke County, W. Va. Cir. Ct. July 2, 1991)…………………………….. 56

*DSPT Int'l., Inc. v. Nahum*, 624 F.3d 1213 (9th Cir. 2010)…………… 31

*Estate of Diaz v. City of Anaheim*, 840 F.3d 592 (9th Cir. 2016)………　30

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.,* 762
　　F.3d 829 (9th Cir. 2014)………………………………………..　29

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.,*
　　786 F.2d 1342 (9th Cir. 1985)…………………………………...　52, 53

*Fenner v. Dependable Trucking Co., Inc.,* 716 F.2d 598
　　(9th Cir. 1983)…………………………………………………...　30, 41, 58

*Frazier v. Norfolk & W. Ry. Co.,* 996 F.2d 922 (7th Cir. 1993)………...　56

*Gallick v. Balt. & Ohio R.R. Co.,* 372 U.S. 108 (1963)……………….　33

*Gallose v. Long Island R. Co.,* 878 F.2d 80 (2nd Cir. 1989)……………　31

*Gorniak v. Nat'l R.R. Passenger Corp.,* 889 F.2d 481
　　(3rd Cir. 1989)…………………………………………………..　45

*Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1193
　　(9th Cir. 2002)…………………………………………………...　48

*Hung Lam v. City of San Jose*, 869 F.3d 1077 (9th Cir. 2017)…….…...　30

*Kern v. Levolor Lorentzen Inc.,* 899 F.2d 772 (9th Cir. 1990)………….　57, 58

*Lavender v. Kurn,* 327 U.S. 645 (1946) ……………………………….　42

*Lewis v. Illinois Cent. R.R. Co.,* 600 N.E.2d 504 (1992)………………　56

*Longoria v. Hunter Express, Limited,* 932 F.3d 360
　　(5th Cir. 2019)…………………………………………………...　56

*Los Angeles Police Protective League v. Gates,*
　　995 F.2d 1469 (9th Cir. 1993)…………………………....…　31

*Manfred v. Superstation, Inc.,* 365 F.App'x 856 (9th Cir. 2010)………..　50

vi

*Mendoza v. Southern Pac. Transp. Co.,* 733 F.2d 631
    (9th Cir. 1984)……………………………………….….. 29

*Monessen Southwestern Ry. Co. v. Morgan,* 108 S.Ct. 1837
    (1988)………………………………………………... 36, 37

*Murphy v. City of Long Beach,* 914 F.2d 183 (9th Cir. 1990)………….. 28

*Neill v. Diamond M. Drilling Co.,* 426 F.2d 487
    (5th Cir. 1970)……………………………………………... 57

*Nitco Holding Corp. v. Boujikian,* 491 F.3d 1086
    (9th Cir. 2007)…………………………………………….. 28, 35

*Norfolk & W. Ry. Co. v. Liepelt,* 100 S.Ct. 755 (1980)………………… 50, 51

*Ohler v. United States,* 529 U.S. 753 (2000)…………………………... 26

*Ollier v. Sweetwater Union High Sch. Dist.,* 768 F.3d 843
    (9th Cir. 2014)…………………………………………….. 40

*Oslund v. State Farm Mutual Automobile Insurance Co.*,
    242 F.2d 813, 815 (9th Cir. 1957)………………………………….. 52

*Passantino v. Johnson & Johnson Consumer Prods.*,
    212 F.3d 493 (9th Cir. 2000)………………………………… 19, 36, 37

*Pierce v. Southern Pac. Transp. Co.,* 823 F.2d 1366
    (9th Cir. 1987)………………………..…………………… 29, 50

*Ruvalcaba v. City of Los Angeles,* 64 F.3d 1323
    (9th Cir. 1995)…………………………………………….... 31, 43

*Sharp Structural, Inc. v. Franklin Mfg., Inc.,*
    283 Fed.Appx. 585 (9th Cir. 2008)………………………………… 29

*S. Pac. Co. v. Guthrie,* 180 F.2d 295, 303 (9th Cir. 1949)……………… 55

vii

*St. Louis Southwestern Ry. Co. v. Dickerson,* 105 S.Ct. 1347 (1985)…..   37

*Tappero v. S. Pac. Transp. Co.,* 859 F.2d 154 (9th Cir. 1988)…………..   28

*Tennant v. Peoria & Pekin Union Ry. Co.,* 321 U.S. 29 (1944)………...   30, 42

*Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140 (2nd Cir. 2014)…...……   55

*Uniterm Food Systems, Inc. v. Swift-Eckrich, Inc.,*
    546 U.S. 394 (2006)…………………………………………….   28, 35

*Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020 (9th Cir. 2003)………   30, 41

## Jury Instructions

*Manual of Model Civil Jury Instructions* (2017), No. 5.4……………...   19

Jury Instruction No. 12…………………………………………...   43, 48

Jury Instruction No. 28…………………………………………...   31, 32, 35

Jury Instruction No. 35…………………………………………...   51

## Rules

Federal Rules of Civil Procedure § 50(b)………………………………   28, 36

Federal Rules of Civil Procedure § 59(a)………………………………   2, 29

Federal Rules of Civil Procedure § 59(e)………………………………...   2, 29

## Statutes

Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51-60………   2

Jones Act, 46 U.S.C. § 688……………………………………………….   37

# INTRODUCTION

This action arises out of a personal injury incident that occurred on December 9, 2012, while Plaintiff/Appellee Greg Gibbons ("Gibbons") was employed as a truck driver for Defendant/Appellant Union Pacific Railroad Company ("Union Pacific"). At the time of the incident, Gibbons was hauling equipment and supplies for Union Pacific through a canyon near Caliente, Nevada. In order to reach his destination, Gibbons had to traverse a homemade railroad "flatcar" bridge on a Union Pacific access road, both owned and maintained by Union Pacific. This bridge was actually an old, pre-World War II, decommissioned railroad flatcar built in 1941, taken out of service in 1963, then repurposed as a bridge by Union Pacific. Union Pacific does this, because it is a low-cost alternative to constructing proper bridges.

The homemade bridge was never tested for weight-bearing capacity, notwithstanding employees routinely drove heavy loads across it, nor were signs posted regarding maximum weight. Further, Union Pacific never measured the "sag" of the bridge nor did it ever assess metal fatigue. The bridge spanned about 100 feet and was suspended approximately 15 feet above the canyon floor.

On this day, Gibbons was driving a dump truck carrying rocks and towing equipment with a collective weight of over 100,000 pounds. As Gibbons crossed

1

the canyon, the bridge collapsed into the underlying riverbed, causing serious and permanent injuries to Gibbons' neck and back, necessitating fusion surgery in his neck. His injuries will require at least two, and likely three, future surgeries. Gibbons was eventually able to go back to work, albeit, medicated, in pain and with functional limitations. The surgeries will bring about additional limitations, further impacting his ability to perform his job. Gibbons has no guarantee of continuing employment with Union Pacific.

Based on these injuries, Gibbons initiated this action against Union Pacific on November 25, 2015, asserting a claim for negligence under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51-60, *et seq.* Beginning on April 23, 2018, the Court conducted a nine-day jury trial to determine liability and damages. On May 7, 2018, the jury reached a unanimous verdict and awarded Gibbons the following: 1) $1,500,000.00 in lost wages and benefits; 2) $500,000.00 in likely future medical and hospital expenses; 3) $1,500,000.00 for mental anguish; and 4) $1,500,000.00 in physical pain and suffering. Union Pacific moved for an amended verdict, new trial or remittitur, citing Federal Rules of Civil Procedure §§ 59(a) and 59(e). The District Court denied the new trial in all respects. Gibbons requests this Court affirm the judgment of the district court.

## STATEMENT OF THE CASE

## I.  GIBBONS PROVED HIS FELA CLAIM AGAINST UNION PACIFIC

### A.  <u>Union Pacific Failed To Provide Gibbons A Safe Place To Work.</u>

On December 9, 2012, Gibbons was working for Union Pacific near Caliente, Nevada.  (5AER000902:1-10; 10AER002201:1-8).  At approximately 6:00 a.m., Gibbons was driving a dump truck loaded with ballast (rock) pulling a trailer itself loaded with a trackhoe on a Union Pacific access road.  (4AE000611:8-11; 4AER000760:22-25; (4AER000764:3-4); 5AER00085721-23; 10AER002200:19-20;   10AER002201:22-24;   10AER002203:19-24;   10AER002204:20-10AER2205:9).  Gibbons was an experienced worker, having worked in the same area for eight years prior to December 9, 2012.  (10AER002290:25-10AER002291:2).

As Gibbons was making his way to the job site, he approached a bridge, which he was required to drive across, as it was the only route for a large truck.  (4AER000762:21-4AER000763:9)

. The bridge was owned by Union Pacific and situated on Union Pacific property.  (4AER000764:3-4; 5AER000857:21-23; 5AER000902:1-10).  It was about 15 feet off the ground.  (3AER00388:20-3AER000389:2).  Gibbons had

crossed this bridge previously with his dump truck and load, and Union Pacific never advised Gibbons not to do so. (4AER000763:10-21; 10AER002291:3-7).

At that time, Gibbons proceeded at approximately five to ten miles per hour across the bridge, when he suddenly felt a jerk or pull. (10AER002284:25-10AER002285:7).

> And at that point it all happened like almost instantaneously. I don't remember a whole lot in between. I remember just hitting the ground with tremendous force. Once I hit the ground, the most vivid thing in my mind was the dust in the cab. The cab had been filled with dust from the impact, and there was a – I had a smell of gunpowder. That's the smell I remember. I'm sure at that point I was a bit dazed.

(10AER002219:9-16).

After some moments had passed, Gibbons radioed his foreman, Eric Hatch, and told him the best he could tell, the "bridge had fell." (10AER002219:16-23). Gibbons does not remember how he got out of the dump truck, but when his supervisor arrived, "i]t was decided that we needed to get the trackhoe off the trailer," so Gibbons drove the trackhoe off the trailer. (10AER002220:5-23).

For the rest of the day, Gibbons can only recall parts of what happened. (10AER002220:24-10AER002222:1). At first, he did not notice he was hurt, but then about 30 minutes later, "[i]t felt like somebody was putting a fist between my shoulder blades." (10AER002221:2-8). Gibbons informed his supervisor, Bart Bergstrom, that he needed to be taken to the hospital. (10AER002221:18-22).

4

B.     Union Pacific Should Have Learned Of A Potential Hazard With Its Homemade Railroad Flatcar Bridge.

The "bridge" that collapsed on December 9, 2012, with Gibbons and his load on top was actually an old, pre-World War II, decommissioned railroad "flatcar" built in 1941, taken out of service in 1963, then repurposed as a bridge. (4AER000595:22-24; 4AER000663:2-4AER000664:3; 5AER000853:12-20; 10AER002201:1-8; 10AER2322-10AER2343 (photos)). Union Pacific uses old flatcars, because it is a low-cost alternative to building proper bridges on its railroad access roads. (4AER000597:21-25; 5AER000855:22-5AER000856:8). A "flatcar" bridge, or "homemade" bridge costs $5,000.00 to $10,000.00, versus upwards of $75,000.00 to construct a traditional bridge. (5AER000856:2-8).

While the service life of a railroad flatcar is between 30 and 50 years, they are pulled from railroad service to become bridges after a derailment. (5AER000859:23-5AER000860:24). The flatcar that constituted this homemade bridge was only used for 22 years prior to being pulled from service. *Id.* Upon being repurposed as an access bridge, no investigation or determination was made as to its load-bearing capacity. (5AER000914:2-4) It was utilized as a flatcar bridge for over 50 years. (4AER000625:14-19; 5AER000853:12-20).

These flatcar bridges are unregulated by the Federal Railroad Administration ("FRA"). (5AER000857:15-23). In fact, there is no federal agency that oversees

5

flatcar bridges, as the FRA only regulates bridges with tracks on them. (5AER000857:15-23). Flatcar bridges are not required to have the safety features of FRA-regulated bridges, including such items as guardrails. (5AER000858:11-5AER000859:10).

Despite the fact Union Pacific's employees were routinely driving dump trucks carrying ballast and towing equipment with a collective weight of over 100,000 pounds across the bridge, Union Pacific never assessed the weight-bearing capacity of the bridge. (5AER000914:2-4; 10AER002291:3-7). A fully-loaded dump truck towing equipment would weigh 130,000 pounds (5AER000875:23-25). At the time of this incident, Gibbons was driving a load of at least 100,000 pounds over the flatcar bridge. (5AER000877:22-5AER000878:4). Yet, there was no evidence that this flatcar-converted-to-bridge was ever designed to hold this capacity. (5AER000913:23-5AER000914:1). Notwithstanding, Union Pacific never posted warnings as to bridge load capacity or risk of collapse. (5AER000864:4-7). All duties with respect to the bridge, including inspections and maintenance, were Union Pacific's alone, as the owner of the bridge. (3AER000507:19-23; 5AER000901:6-5AER000902:10).

Even so, Union Pacific's bridge inspector, Randy Winn, testified he did not know the load capacity of the bridge, was not aware that anyone had that information

and had no knowledge that the bridge capacity had ever been tested. (4AER000613:24-4AER000614:11). Gibbons' supervisor, Bart Bergstrom, also testified no one at Union Pacific ever advised him regarding the maximum load of the homemade flatcar bridge. (4AER000762:12-15). In fact, no one at Union Pacific ever advised Gibbons or Bergstrom not to use the flatcar bridge with a dump truck carrying a trackhoe, and Bergstrom never advised Gibbons of as much. (4AER000763:7-21). Gibbons testified there were no warning signs and he was never advised by anyone at Union Pacific as to any weight limit. (10AER002212:24-10AER002213:10; 10AER2214:11-17).

Mr. Winn, who is not an engineer, testified he only ever performed a visual inspection. (4AER000589:12-14; 4AER000591:25). That is, he would view the bridge from above and below for obvious defects. (4AER000589:15-22). Mr. Winn admitted he never measured the sag of the bridge, never utilized a digital level to determine whether the bridge was still flat, never utilized thermal imagining equipment to assess metal fatigue, never obtained x-rays to reveal stress fractures and never did any metal testing whatsoever. (4AER000587:8-10; 4AER000587:21-4AER000588:1; 4AER000588:22-4AER000589:3; 4AER000591:23-4AER000592:5). He did one of these visual inspections two months prior to this bridge collapsing, but performed no testing. (4AER000595:1-11).

7

Mr. Winn was responsible for inspecting 100 flatcar bridges, 500 to 800 other bridges, 400 culverts and 20 tunnels in his jurisdiction, twice annually. (4AER000579:20-4AER000584:21). To do this, he had to accomplish about ten inspections – *per day*. (4AER000584:18-21). Mr. Winn admitted he did not request an engineer to come assess the integrity of the homemade flatcar bridge on the date of his last inspection before it collapsed. (4AER000570:14-4AER000571:1; 4AER000595:1-16).

Gibbons' expert, Mark Burns, is an actual forensic engineer, receiving his mechanical engineering degree from the Australian National University. (5AER000822:23; 5AER000825:21-24). In his role as a forensic engineer, Mr. Burns investigates incidents to determine root causes and what could have been done to prevent them. (5AER000823:1-5).

Regarding flatcar bridges, Mr. Burns referenced specific studies that question the wisdom of constructing access bridges in this manner and otherwise, recommend safety measures, which include prohibiting loads in excess of one-half the weight capacity limit; being temporary in nature; and installing adequate railings, none of which were done by Union Pacific. (5AER000984:7-17; 5AER000986:16-18; 5AER000987:5-12). It is acknowledged in the industry that since the load history of flatcars is unknown, estimating remaining fatigue life is difficult, if not

impossible, such that, for all these reasons, flatcars should not be used as bridges. (*Id.*; 5AER000988:3-7, 21-25; 5AER000989:9-15). In sum, Mr. Burns testified that industry standards called for greater measures of inspection and support than performed by Union Pacific. *Id.*

Mr. Burns also testified that this homemade flatcar bridge had no pilings or piers in the middle of the substructure to reinforce it, and upon reviewing photographs of the bridge prior to the herein incident – from 2006 and 2012 – visible, worsening sagging in the middle of the bridge was evident. (10AER000908:9-10AER000910:20; 5AER000911:2-11; 5AER000912:15-5AER000913:11; 10AER002171 (2006 bridge photo); 10AER002172 (2012 bridge photo)). His analysis as to why the bridge failed consisted of the following factors: improper inspections for imminent failure and sagging; excessive loading, coupled with corrosion, exposure to elements and metal fatigue; and lack of maximum load signage. (5AER000852:12-5AER000853:11; 5AER000900:6-21).

Jury Instruction No. 28 was read to the jurors, which states, in pertinent part: "[I]f an employer learns *or should learn* of a potential hazard, it must take reasonable steps to investigate and inform and protect its employees, or it will be liable when injury occurs." (3AER000510:4-22) (emphasis added).

9

## II.  THE EVIDENCE PRESENTED SUPPORTS THE JURY'S AWARDS FOR GIBBONS' DAMAGES

Gibbons testified that upon feeling a jerk or pull, he remembers hitting the ground with tremendous force and being dazed. (10AER002219:9-16; 10AER002284:25-10AER002285:7; 10AER002291:3-7). He thought the bridge had fallen with him on top and radioed his foreman to report. (10AER002219:16-23). Thereafter, Gibbons could only recall parts of the day, not noticing he was hurt until about 30 minutes later, at which point he felt distinct pain in his upper back. (10AER002220:24-10AER002222:1). Gibbons' supervisor, Mr. Bergstrom, testified Gibbons told him he was having pain in his upper neck. (4AER000757:22-24). Gibbons then asked Bergstrom to get him to the hospital. (10AER002221:18-22).

At the emergency room in Cedar City, Utah, Gibbons was x-rayed to ensure his back was not broken and received pain medications. (10AER002221:22-25; 10AER002239:17-10AER002240:1). However, his pain persisted and he was forced to seek more treatment a few days later. (10AER002242:14-24). Union Pacific referred Gibbons to Alan Colledge, M.D. (10AER002243:3-10).

On December 13, 2019, Gibbons reported to Dr. Colledge that he was experiencing sharp back pain due to a 15-foot fall in a dump truck, when the bridge collapsed. (10AER002246:2-17). He described his pain as being exacerbated by

10

bending, lifting, driving and standing. (10AER002246:18-20). Gibbons indicated his pain was between his shoulder blades and low back, and that he was also experiencing neck pain, left arm/shoulder pain and left leg pain. (7AER001303:8-12; 10AER002166-10AER002168; 10AER002247:6-9).

Less than one month later, on January 9, 2013, Gibbons reported he was experiencing headaches radiating up through his upper back and neck. (10AER002169; 10AER002247:5-25). His records indicate he was only able to sit, stand or walk for five minutes before being forced to change positions. (*Id.;* 10AER002248:22-25). By March 15, 2013, Gibbons was still experiencing back pain and neck pain radiating up through his head. (10AER002249:9-23). Gibbons received MRIs of his mid and lower back, though not of his neck. (10AER002252:25-10AER002253:6).

During this time, Gibbons continued to work, because, he testified, "I mean, I wasn't crippled. So, I'm not going to get a paycheck if I don't work, so, of course, I'm going to go to work. And they told me I didn't have to do anything physical, which I had a restriction anyway." (10AER002251:10-15). In fact, Dr. Colledge had restricted Gibbons' activities and work, and while Gibbons underwent physical therapy during this time -- including for his neck, by February 4, 2013, he had a diagnosis of cervicalgia -- his symptoms did not improve. (5AER001094:11-

11

5AER001095:7; 5AER001632; 10AER002250:7-11; 10AER002251:22-25; 10AER002252:19-24). Dr. Colledge informed Gibbons he was not going to see further improvement, so Gibbons felt as though he may as well go back on full-duty. (10AER002253:7-22). About the effect his injuries had on Gibbons at work, his supervisor, Mr. Bergstrom, testified: "[H]e did have some pain. He would tend to take things easier and, you know, just he was cautious of what he was doing." (4AER000759:14-19).

> Gibbons described his difficulty at work over the next year:
>
> It wasn't fun. Like I say, whenever I would do strenuous stuff, it would definitely be a lot worse. Pulling, anything jerking or pulling on my back is really hard on me. That's probably my worst part of it. I work with really good guys. They – they would help me out a lot throughout the next year so I got through it." *Id.* However, over the course of that year, Gibbons headaches got much worse. (10AER002254:8-19). "The last straw" was a headache that lasted for weeks. *Id.* In June of 2014, Dr. Cooledge prescribed a painkiller he was told was also used for depression, but while it took away the pain, the side effects were too overwhelming for Gibbons.

(10AER002253:23-10AER002254:7; 10AER002255:9-25).

In December, Gibbons decided he had to try something else. (10AER002256:3-6). He found a doctor in his hometown – Sam Linford, M.D. – who did MRIs, including one of Gibbons' neck. (10AER002256:1-16). Dr. Linford found herniated disks and referred Gibbons to Dr. Daley. (7AER001400:7-20). During May-June 2015, Dr. Daley tried epidural shots, but Gibbons reported after

the first one, they did not work and the pain in his upper back, as well as the radiating neck pain, returned. (10AER002557:2-21). By December of 2015, the pain was very bad and interfering with Gibbons' daily life. (10AER002257:22-10AER002258:5).

Gibbons began seeing a physician closer to his home, Geoffrey Skene, M.D., from whom he received additional epidurals. (10AER002258:12-22). However, even though Gibbons testified he was scared, he was forced to proceed with fusion surgery in his neck, which Dr. Beck performed on February 25, 2016. (10AER002259:13-10AER002260:5, 16-20). After surgery, Gibbons said he "felt way better. The pressure was gone. . . . [F]rom what I was feeling before, it felt way better." (10AER002261:13-16.) Gibbons was off work for two months, then believes he returned to full duty work full. (10AER002261:17-25). While Gibbons has continued to work since that time, he does so with pain. (10AER002262:1-7). His headaches are more sporadic, versus daily, but his pain still radiates up his neck upon engaging in activity. (10AER002262:4-14). He manages the pain with Lyrica – "[i]t's probably been the saving factor" – but has been forced to remain on the medication to date. (10AER002262:11-16).

Union Pacific's expert, Scott Knorpp, M.D., says Gibbons did not sustain a neck injury, his headaches were not related to the incident, and his low back injury

13

was minor. (5AER001041:1-5; 5AER001043:12-14; 5AER001051:23-25). Dr. Knorpp even suggested Gibbons' low back pain is "psychosocial, psychological in origin." (5AER001077:9-13; 5AER001078:3-8).

While Dr. Knorpp did agree Gibbons' thoracic MRI showed there are disk herniations for which there have been no repair, he opines "none is required." (5AER001082:25-5AER001083:4; 5AER001086:14-17). However, Dr. Knorpp is a *rehabilitation psychiatrist*. (5AER001079:13-14). He admitted he is not a surgeon, has never operated on a spine, and has not performed a cervical disk fusion or a lumbar disk fusion. (5AER001079:2-12).

Conversely, Gibbons' physician expert, Thomas Dunn, M.D., is a board-certified orthopedic spine surgeon. (7AER001365:25-7AER001366:2). He has performed thousands of spinal surgeries, with 99 percent of those being on people who cannot live with their pain. (7AER001368:21-7AER001369:12).

Both Dr. Dunn and Dr. Colledge agreed the bridge collapse resulted in injuries to disks in Gibbons' cervical, thoracic and lumbar spine. (7AER001376:18-25). Dr. Dunn testified that to a reasonable medical probability, all treatment received by Gibbons was reasonable and necessary, including the neck surgery. (6AER001144:18-23; 6AER001155:4-17). Dr. Dunn says Gibbons will experience

14

ongoing pain relative to the neck fusion, as well as due to the injuries to his thoracic and lumbar spine. (6AER001144:24-6AER001145:25; 6AER001150:1).

The need for future treatment as a result of injuries Gibbons sustained in the bridge collapse includes an additional surgery near the fusion in the neck within 15 to 20 years due to "shift of motion or stress to what we call the adjacent segment . . . . which will then result in accelerated degeneration of that disc." (6AER001145:1-14). The lumbar disk that was herniated in the incident remains an ongoing source of pain for Gibbons and will need to be surgically repaired in the future. (6AER001149:11-6AER001150:1). To the extent Gibbons had degenerative disk disease in that area, Dr. Dunn states the bridge collapse aggravated it. *Id.* at 15-21. Gibbons also suffers ongoing back pain due to the two herniated disks in the thoracic spine – one between T-5 and T-6, and one between T-6 and T-7. (7AER001388:17-7AER001389:11; 7AER001391:20-7AER001392:9). Dr. Dunn agreed with Dr. Colledge's assessment that this injury was recent. (6AER001156:8-13). Dr. Dunn left open the possibility thoracic surgery would be reasonably necessary, should that condition continue to deteriorate and impair Gibbons' ability to function. (6AER001155:25-6AER001156:7). After Gibbons receives these surgeries, he will have numerous functional limitations, including frequent over-the-shoulder

15

activities, bending, stooping and lifting, all of which will impact his ability to perform his job. (6AER001158:8-20).

As a result, Dr. Dunn testified the reasonable and necessary cost for the cervical surgery at C4-C5 would be approximately $132,237.00, and for the lumbar reconstruction surgery, that is, the low-back fusion, about $268,224.00. (AER001149:2-10).[1]

Gibbons makes around $30.00 per hour with benefits, which, he said, equates to "[r]ight around 60 [to] $70,000 a year. It depends." (10AER002269:2-5). His job is not guaranteed for life, or even for another day. (7AER001310:23-7AER001311:6). He was 42 years old at the time of the trial and had no plans to retire at age 60, because, "you don't know what could come," though he said that would be "ideal." (7AER001296:13-7AER001297:2). Gibbons has a high school education and is skilled as a laborer. (10AER002178:22-10AER002179:3; 10AER002182:21-23).

---

[1] In the Introduction section of Appellant's Opening Brief, p. 2, Union Pacific alleges Gibbons' future medical expenses "would be paid by Union Pacific pursuant to a collective bargaining agreement." However, there was no evidence of this proffered at trial and Union Pacific neither mentions it elsewhere in its Brief nor cites to the record in support.

## III. THE EVIDENCE PRESENTED AT TRIAL DID NOT VIOLATE ANY PRETRIAL RULINGS

### A. Gibbons Was Precluded From Presenting An Economist Expert At Trial And Gibbons Did Not Present An Economist Expert At Trial.

Following Gibbons' recuperation from surgery and after experiencing a period of time with his body's neck fusion and the accompanying mobility limitations, Dr. Dunn determined Gibbons will require additional medical treatment, including surgery. (12AER002719:8-12). Gibbons had been hopeful the litigation with his employer, Union Pacific, would resolve at the October 2017 settlement conference, but that did not occur. (12AER002719:13-16). Thus, at the close of discovery, Gibbons filed a motion for leave to designate an additional expert witness and reopen discovery for a limited purpose. (12AER002707). The motion was made to add an expert economist, Terrence Clauretie, Ph.D., to further testify regarding future damages owing to the nature and extent of Gibbons' injuries, specifically the February 25, 2016, anterior cervical diskectomy and instrumented fusion, C-5 through C-7. (12AER002708:3-9; 12AER002719:6-7).

However, Magistrate Judge Hoffman denied Gibbons' additional expert economist designation. (11AER002652:1-10). In the Order, Judge Hoffman stated his findings as follows:

> The disclosure of Dr. Clauretie's expert report was untimely because it was made after May 9, 2017, the date to make expert disclosures. . . .

> [T]he late designation of Dr. Clauretie would be prejudicial to
> Defendant [Union Pacific] because it has not had the opportunity to
> defend against the future economic damages claim contained in the
> report. . . ."

(*Id.*)

Judge Hoffman's Order denying the motion was expressly limited to Gibbons'

request to add Dr. Clauretie as an economic expert. (11AER002649-

11AER002652). There was no blanket prohibition of evidence regarding Gibbons'

future damages. (AER000005:13-15; 11AER002651:20-22). As stated by District

Court Judge Gloria Navarro in her ruling denying Union Pacific's motion to alter or

amend the judgment and motion for new trial or, in the alternative remittitur,

> Absent from Judge Hoffman's ruling was any mention of prohibiting
> future damages in general. In fact, the Order explicitly references Dr.
> Dunn's report as putting future economic injury at issue.

(*Id.*)

Specifically, Judge Hoffman confirmed Gibbons clearly had "evidence of

future economic harm" as manifest "when Dr. Dunn issued his report."

(11AER002651:20-21). Moreover, Union Pacific moved forward with the

understanding that denial of Gibbons' motion to add an additional expert only

excluded Mr. Clauretie, and that Dr. Dunn would be testifying at trial regarding

future damages. (11AER002616:19-11AER002617:2).

18

Finally, while Gibbons intended to have Dr. Clauretie opine regarding the present value of future economic damages, this was done in an "abundance of caution," since, as explained in Gibbons' opposition to Union Pacific's motion to alter or amend the judgment, et al., present value evidence should have been pursued, if at all, by Union Pacific:

> In fact, while Plaintiff took it upon himself to move for the admission of expert testimony to opine regarding present value via the above Motion, this actually should have been sought by UNION PACIFIC. Reducing future damages to present value is a defendant's concern, while a plaintiff's concern is to have the jury properly assess inflation. *Passantino v. Johnson & Johnson Consumer Prods*., 212 F.3d 493 (9th Cir. 2000); *Manual of Model Civil Jury Instructions* (2017), No. 5.4, "Damages Arising in the Future – Discount to Present Cash Value," comment; *see also Better Building Maintenance of the Virgin Islands, Inc. v. Lee*, 60 V.I. 740, 761 (2014). However, Plaintiff never suggested that the jury should inflate damages. Hence, there is absolutely no harm.

(2AER000033:18-25; 9AER002100:17).

Moreover, Union Pacific was made fully aware of 9th Circuit controlling precedent regarding present value, when Gibbons briefed the issue in his opposition to Union Pacific's later motion *in limine* to exclude evidence of Gibbons' future medical expenses and certain expert opinions of Dr. Dunn. (9AER002095-2111). That is, expert testimony is not required to reduce a plaintiff's future damages to present value, and that otherwise, it is a defendant's responsibility to introduce evidence of the proper present value discount rate. (9AER002097:1-5, 16-26).

19

**B.** <u>Gibbons Was Precluded From Eliciting Testimony From Dr. Dunn At Trial That Gibbons Would Lose Five To Ten Years Of Work Life And Gibbons Did Not Elicit Testimony From Dr. Dunn At Trial That Gibbons Would Lose Five To Ten Years Of Work Life.</u>

At calendar call, Union Pacific raised orally a newfound concern that Dr. Dunn should not be permitted to testify at trial regarding future damages – *at all*. (11AER002616:19-11AER002617:2). Throughout the course of the exchange, Union Pacific *failed to cite any case law whatsoever* in support of its position that Dr. Dunn should not be permitted to testify as to future damages, because he did not have "the qualifications to render the present value of those services to be rendered in the future." (11AER002617:1-4, 11-16). Gibbons counsel stated Dr. Dunn would also testify that Gibbons' work life would be reduced by five to ten years, due to the several herniations in his back and the cervical fusion in his neck, based on Dr. Dunn's education, training and experience, as well as the literature on the subject. (11AER002618:1-9). The district court stated Dr. Dunn could testify regarding future medical damages, as well as limitations on functionality that Gibbons would experience, and a "five to ten" year reduced work life was "an argument that you can make in closing argument." ((11AER002628:3-4; 11AER002632:5-22).

Three days before trial, Union Pacific filed its motion *in limine* to exclude evidence of Gibbons' future medical expenses and preclude Dr. Dunn from

testifying that Gibbons' work life would be reduced by five to ten years. (11AER002554). It was not immediately heard by the court. (7AER001352:1-8).

Upon commencement of trial, during opening statement, Gibbons' counsel stated the following:

> One of the issues that you're going to hear Dr. Dunn address is the issue regarding adjacent segment dysfunction. One of the problems that he will tell you that people can encounter when they have this type of hardware placed in their body -- and Greg's 42 years old. He's got another probably 25 years of work life ahead of him if he's able to make it. But the only thing he's trained to do is work on the railroad and the only type of job that he's specifically trained on is how to operate heavy equipment. That's that. And so currently he makes about $70,000 a year doing that job earning about 40 bucks an hour when you add his pay and his benefits together. And so what happens to Greg Gibbons if he's not able to perform that job anymore?

(11AER002531:3-15).

Notwithstanding the above in no way ran counter to anything the Court had stated during calendar call, Union Pacific requested a sidebar:

> MR. HUNT: Mr. Morris is attempting to present to the jury a work capacity -- shortened work life capacity and we filed our Daubert motion as the Court recognized because he filed his emergency motion and insists our defense would be inappropriate so he could try to get it into the juror's mind that he has the usual work life capacity and he also tries to get numbers, the same thing. I've asked you to give him an admonishment that, you know, at this point you haven't decided that but you are getting ready.
> THE COURT: I didn't say that. . . .

(11AER002531:16-11AER002632:22).

After much discussion, the district court issued *one* ruling, as follows: "All right. So your instruction is to stay away from that area until I am provided with more information that would permit me to determine whether you will be able to introduce that evidence before the jury. But at this point I'm not convinced." (11AER002534:2-6). Because it was determined by the district court and Union Pacific counsel that Gibbons' counsel did not actually say anything improper in the above-cited opening, the court did not instruct the jury to disregard any statements by Gibbons' counsel. (11AER002535:7-11AER002536:3).

On the third day of trial, the court took up the matter of Union Pacific's motion *in limine*. (7AER001352:1-8). The court noted case law that holds to recover for lost earning capacity, a plaintiff must produce evidence suggesting his injuries have narrowed his range of economic opportunities and show his injury has caused a diminution in his ability to earn a living, and that "there's a preference for these issues to be resolved by the jury with a proper instruction." *Id.* The court also stated that the part causing concern was testimony as to work life capacity being reduced "by a number as opposed to just generally." (7AER001352:23-7AER001353:2).

Ultimately, the court granted in part and denied in part: "[Dr. Dunn] does have the experience to testify as to future medical issues that plaintiff may face and that accompany physical restrictions, but he is not qualified to say how this will

22

affect plaintiff's work life *specifically a reduction of five to ten years*." (7AER001356:8-12) (emphasis added). The court added, "I think that's a very small restriction. . . . I think I have removed the tiniest, smallest part of all the information that he was planning to give." (7AER001356:18-22).

Thus, Dr. Dunn, already a duly-disclosed expert qualified to testify regarding Gibbons' future damages, was permitted to testify regarding future damages at trial, which in no way disturbed the Magistrate's Order denying Gibbons' economic expert. (1AER00004-9; 7AER001356:8-12; 11AER2649-52). Dr. Dunn's testimony properly included reasonable costs for Gibbons' future surgeries. (6AER001150:2-24).

C.   Gibbons' Counsel Was Not Limited At Trial In Arguing Work Life Capacity Reduction, But Even If He Was, Gibbons' Counsel Still Did Not Violate Any Evidentiary Rulings Regarding Work Life Capacity.

While the district court limited Dr. Dunn's testimony, in that, he was precluded from testifying plaintiff's work life will suffer a specific reduction of five to ten years," the court never precluded argument by Gibbons' counsel in that regard. (7AER001356:8-12; 11AER002632:5-22). In fact, the court anticipated such argument:

> MR MORRIS: He said five to ten. He said it – its' a range, but this guy will not be doing the work that he's doing right now at age 60.
> ***

23

> THE COURT: I think that's an argument that you can make in closing argument, taking the information that he provides as far as this is going to continue to affect his ability to do X, Y, and Z – which, by the way, is part of his work functions.

(11AER002632:14-22).

Even so, Gibbons' counsel did not make that argument in closing. Rather, Gibbons' co-counsel stated the following:

> And the reason I want to bring that up very briefly, even though Mr. Morris is going to talk mostly about the damages, is that this is our one trial so all the evidence in this case has to be presented in one trial. We don't come back in ten years and say there's been another surgery, there's been other job performance issue, all those have to be presented and forecasted to you with the experts and what the medical records and other things predict to you as best we can without having a crystal ball.

(2AER000131:5-13).

Clearly, Gibbons' co-counsel was not discussing a specific range of work life reduction, notwithstanding, he was wholly permitted to do so. *Id.*; (7AER001356:8-12; 11AER002632:5-22). Counsel was relaying to the jury this was Gibbons' one and only opportunity to recover for his damages. *Id.* Similarly, Gibbons' other co-counsel stated the following:

> As Mr. Coon mentioned to you, this is Mr. Gibbons' only day in court. We don't get to come back in five years and say, well, now he's had another surgery, we would like to talk to you about some additional damages. It doesn't work that way. We can't come back in 10 or 15 years and resubmit his case. It's today. And the evidence that's before you is important evidence for you to use as a prediction about his future and as an understanding of what's happened here.

24

(11AER000168:19-11AER000169:3).

Union Pacific did *not* object at trial to any of the above closing argument. *Id.*; (2AER000131:5-13).

Finally, in the portion of closing argument regarding "lost wages and benefits," Gibbons' counsel told the jury, based on the evidence, that Gibbons is 42 years old and earns $70,000.00 per year; that he does not have a job guaranteed for life or even a day; that Dr. Dunn testified Gibbons would be impacted by his injuries and surgeries; that the typical work cessation age is 65, then suggested to jurors how they could go about calculating lost wages, if, for example, Gibbons' work life was cut short by ten years -- "then that amount would be $700,000." (2AER000173:7-2AER000174:19). Twice therein, Union Pacific objected and twice the court overruled. (2AER000173:21-2AER000174:4). This argument did not violate the court's prior ruling, because counsel did not argue the evidence supported a specific lost wage span of years, and in any event, the court did not preclude counsel from doing so. (7AER001356:8-12; 11AER002632:5-22). When the court reviewed this issue on Union Pacific's motion to alter or amend the judgment, et al., it ruled as follows:

> [T]he Court's ruling on Defendant's Motion in Limine did not preclude
> Plaintiff from arguing future damages. The Court's ruling was limited
> to Dr. Dunn's specific opinion that Plaintiff would lose 5-10 years of

25

work life. As clarified throughout trial, the Court precluded this opinion because Dr. Dunn lacked a scientific basis to support that *particular* range. The Court did not preclude Dr. Dunn from testifying as to loss of work life in general. Furthermore, even had the Court departed from its initial ruling, limine rulings are provisional and therefore non-binding on the trial judge. *See Ohler v. United States,* 529 U.S. 753, 758 n.3 (2000).

(1AER00005:16-23.)

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion by denying Union Pacific's post-judgment motions, since Gibbons proved his FELA claim, including foreseeability. Appellate review of sufficiency of the evidence is precluded, as Union Pacific failed to file a post-verdict motion for judgment as a matter of law. Otherwise, the weight of the evidence clearly showed Union Pacific should have learned about the hazard that injured Gibbons.

The district court did not abuse its discretion by upholding damages awarded by the jury. Regarding future damages, the law does not require Gibbons to put forth evidence reducing to present value; rather, it was incumbent upon Union Pacific to do so, if at all. In that regard, Union Pacific agreed to the special verdict form and Gibbons use of it at trial was proper to which Union Pacific neither objected nor raised the issue in its post-judgement motions. Thus, Union Pacific was not

prejudiced by the award of $500,000.00 for future medical damages, nor was it excessive in light of the three future surgeries Gibbons faces.

Pre-trial evidentiary rulings permitted Gibbons' physician expert to testify regarding future medical damages, as well as lost earning capacity generally, which he did without objection by Union Pacific. Union Pacific does not expressly request that the pre-trial rulings be overturned, but insinuates they were wrongly decided or otherwise, improperly unenforced. However, Union Pacific made no effort to show they were erroneous and substantially prejudicial.

The jury's awards of $1,500,000.00 in lost wages and benefits, $1,500,000.00 for mental anguish, and $1,500,000.00 for physical pain and suffering are supported by the record, permissible speculation, common sense and reasonable inferences. Gibbons' counsel properly argued to the jury regarding lost earning capacity, consistent with the district court's rulings, and to the extent Union Pacific is now contending the award was excessive, most of counsel's comments were not objected to at trial and Union Pacific neither moved for a mistrial nor raised the issue post-judgment.

The ground there was not substantial evidence to support the jury's verdict is not properly before the Court, as Union Pacific did not, at the close of the evidence or case, interpose a motion for a directed verdict. Hence, the issue now is whether

Gibbons presented any evidence, which is clear he did. Moreover, as to the physical pain and suffering award, Union Pacific advanced neither argument nor support. Because Union Pacific failed to show the verdict was excessive, a remittitur is inappropriate.

## ARGUMENT

### I.    STANDARD OF REVIEW

   A.    <u>The Reviewing Court Considers The District Court's Denial Of A FRCP Rule 59 Motion For New Trial And/Or Motion To Alter Or Amend Judgment And/Or Remittitur For Abuse Of Discretion.</u>

Failure to file a post-verdict motion for judgment as a matter of law precludes appellate review of sufficiency of the evidence to support the verdict. *See Nitco Holding Corp. v. Boujikian,* 491 F.3d 1086 (9th Cir. 2007) (explaining the Supreme Court's decision in *Uniterm Food Systems, Inc. v. Swift-Eckrich, Inc.,* 546 U.S. 394 (2006), precludes even plain error review when a party fails to file a rule 50(b) motion).

The grant of a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court." *Murphy v. City of Long Beach,* 914 F.2d 183, 186 (9th Cir. 1990) (quoting *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33 (1980)). In FELA cases, the district court's discretion is even further circumscribed. *See Tappero v. S. Pac. Transp. Co.,* 859 F.2d 154 (9th Cir. 1988). The verdict must

be honored "unless there is a complete absence of probative facts to support the jury's conclusion" because in these cases "the jury's power to engage in inferences is significantly broader than in common law negligence actions." *Pierce v. Southern Pac. Transp. Co.,* 823 F.2d 1366, 1370 (9th Cir. 1987). Only "slight" or "minimal" evidence is required to raise a jury question of negligence in a FELA case. *Mendoza v. Southern Pac. Transp. Co.,* 733 F.2d 631, 632 (9th Cir. 1984). "'[I]t is only necessary that the jury's conclusion be one which is not outside the possibility of reason on the facts and circumstances shown.'" *Id.* at 633 (quoting *Chicago, Rock Island & Pac. R. Co. v. Melcher,* 333 F.2d 996, 999 (8th Cir. 1964)).

A district court's ruling on a motion for new trial pursuant to FRCP Rule 59(a) is reviewed for an abuse of discretion. See *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.,* 762 F.3d 829, 844-45 (9th Cir. 2014) (noting significant deference owed the district court's determination regarding whether new trial is warranted). Likewise, the lower court's ruling on a Rule 59(e) motion to alter or amend the judgment is reviewed for an abuse of discretion. *Sharp Structural, Inc. v. Franklin Mfg., Inc.,* 283 Fed.Appx. 585, 588 (9th Cir. 2008).

Under the abuse of discretion standard, a reviewing court cannot reverse absent a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of relevant factors. *See*

*Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 601 (9th Cir. 2016) (reversal only when reviewed decision lies beyond the pale of reasonable justification). The abuse of discretion standard requires an appellate court to uphold a district court determination that falls within a broad range of permissible conclusions. *See Hung Lam v. City of San Jose*, 869 F.3d 1077, 1085 (9th Cir. 2017).

Also, the district court's determination whether a jury verdict is excessive and therefore, requires remittitur or a new trial is reviewed under an abuse of discretion standard. See *Del Monte Dunes at Monterey, Ltd. v. Monterey*, 95 F.3d 1422, 1434-35 (9th Cir. 1996). To determine whether a damages award is excessive, a district court views the evidence concerning damages in a light most favorable to the prevailing party. *Fenner v. Dependable Trucking Co., Inc.,* 716 F.2d 598, 603 (9th Cir. 1983). Typically, unless the amount of damages is "grossly excessive or monstrous," a court will not disturb an award. *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1040 (9th Cir. 2003). In FELA cases, the Supreme Court has long emphasized reviewing courts are not permitted to set aside jury verdicts "merely because the jury could have drawn different inferences or conclusions or because [the courts] feel that other results are more reasonable." *Tennant v. Peoria & Pekin Union Ry. Co.,* 321 U.S. 29, 35 (1944). A trial court's decision not to allow remittitur

30

should be reversed only upon a showing of "clear abuse of discretion." *See Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1477 (9th Cir. 1993).

"[T]he appellant challenges the jury verdict, so we 'view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor.'" *DSPT Int'l., Inc. v. Nahum*, 624 F.3d 1213, 1216 (9th Cir. 2010) (citation omitted).

B. The Reviewing Court Considers The District Court's Evidentiary Rulings For Abuse Of Discretion.

To obtain a new trial based on erroneous evidentiary rulings, the moving party must show that the rulings were both erroneous and substantially prejudicial. *See Ruvalcaba v. City of Los Angeles,* 64 F.3d 1323, 1328 (9th Cir. 1995).

II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING UNION PACIFIC'S POST-JUDGMENT MOTIONS, BECAUSE GIBBONS PROVED HIS FELA CLAIM, INCLUDING "FORESEEABILITY"

Pursuant to controlling precedent, liability for negligence under FELA attaches in the following circumstances: "[I]f an employer learns or should learn of a potential hazard, it must take reasonable steps to investigate and to inform and protect its employees, or it will be liable when injury occurs. *Gallose v. Long Island R. Co.,* 878 F.2d 80, 85 (2nd Cir. 1989). The precedent is repeated in Jury Instruction No. 28:

An employer is not liable if it has no reasonable way of knowing that a potential hazard exists. An employer's duty to provide a safe working environment extends only to foreseeable dangers or risks. Thus, if an employer had no reasonable ground to anticipate that a particular condition would or might result in a mishap or injury, then the employer is not negligent by failing to correct the condition. However, *if an employer learns or should learn of a potential hazard, it must take reasonable steps to investigate and to inform and protect its employees, or it will be liable when injury occurs.* If an employer's negligence is found, however, then the employer is responsible for damages even if the extent of the injury or the manner in which it occurred was not probable or foreseeable.

(3AER000510:5-22).

Union Pacific cites to *CSX Transp. Inc. v. McBride,* 131 S.Ct. 2630, 2643, (2011), asserting Gibbons' FELA cause of action requires an examination of the relevant standard of care *within the industry* and whether the party's conduct fell below that standard of care. (UP Br. 33)[2]. However, *CSX* requires no such thing. Rather, the requisite inquiry is whether the railroad used "that degree of care which *people of ordinary prudence and sagacity* would use under the same or similar circumstances." *CSX Transp. Inc.,* 131 S.Ct. at 2643 (emphasis added). In fact, *CSX* takes note that a properly instructed jury in a FELA case, would be told to use their "common sense" in reviewing the evidence. *Id.* Nowhere in the opinion is reference made to any such "industry" criterion.

---

[2] Citations to "UP Br. __" refer to pages in appellant's opening brief.

The essential element of a FELA lawsuit is reasonable foreseeability. *Id.* (citing *Gallick v. Balt. & Ohio R.R. Co.,* 372 U.S. 108, 117 (1963)). "If negligence is proved, [ ] and is shown to have '*played any part, even the slightest, in producing the injury,*' then the carrier is answerable in damages 'even if the extent of the [injury] or the manner in which it occurred' was not '[p]robable' or 'foreseeable.'" *Id.*; citing *Gallick,* 372 U.S. at 120-121 (internal quotations marks omitted; emphasis in original).

The evidence reveals the homemade flatcar bridge was very old, built in 1941. (4AER000595:22-24; 4AER000663:2-4AER000664:3; 5AER000853:12-20; 10AER002201:1-8). Despite the fact Union Pacific's employees were routinely driving loads in excess of 100,000 pounds across the bridge, Union Pacific never assessed the weight-bearing capacity of the bridge. (5AER000914:2-4; 10AER002291:3-7). There was no evidence this homemade bridge was ever designed to hold this capacity. (5AER000913:23-5AER000914:1). Neither Union Pacific's bridge inspector, Mr. Winn, nor Gibbons' supervisor, Mr. Bergstrom, knew the load capacity of the bridge. (4AER000613:24-4AER000614:11; 4AER000762:12-15). Union Pacific never posted warnings as to bridge load capacity or risk of collapse. (5AER000864:4-7). Gibbons was never told there was

a weight limit on the bridge. (10AER002212:24-10AER002213:10; 10AER2214:11-17).

Mr. Winn, who is not an engineer, only ever performed a visual inspection of the bridge. (4AER000589:12-14; 4AER000591:25). He admitted he never measured the sag of the bridge, never utilized a digital level to determine whether the bridge was still flat, never utilized thermal imagining equipment to assess metal fatigue, never obtained x-rays to reveal stress fractures and never did any metal testing whatsoever. (4AER000587:8-10; 4AER000587:21-4AER000588:1; 4AER000588:22-4AER000589:3; 4AER000591:23-4AER000592:5).

Gibbons' expert forensic engineer Mark Burns testified as to the limited load-bearing capacity and weak structural integrity of the homemade bridge, including the fact that specific studies recommended not using flatcars for bridges at all, and otherwise, specifically prohibiting loads in excess of one-half the weight capacity, which Union Pacific failed to do. (5AER000822:23; 5AER000825:21-24; 5AER000984:7-17; 5AER000986:16-18; 5AER000987:5-12; 5AER000988:3-7, 21-25; 5AER000989:9-15; 10AER000908:9-10AER000910:20; 5AER000911:2-11; 5AER000912:15-5AER000913:11). This evidence is further supported by photographs that show visible sagging in the center of the bridge prior to its

collapse. (10AER002171 (2006 bridge photo); 10AER002172 (2012 bridge photo)).

Jury Instruction No. 28, read to the jurors, stated it was the employers' duty to provide a safe working environment, which extended to foreseeable dangers. (3AER000510:4-22). That the defect was not apparent to workers, including Gibbons, does not relieve Union Pacific of its obligation to provide suitable equipment and a safe workplace. The duties to be exercised with respect to the bridge were Union Pacific's alone, which included meaningful inspections and utilizing equipment designed to reveal problems so as to take reasonable steps to protect its employees, including warnings, repairs and/or replacement. Given the age of the repurposed flatcar, obvious exposure to weather, the corrosive nature of metal and the routine stressing of the bridge due to heavy loads, something more than merely looking at the bridge was necessary, as it was reasonably foreseeable the bridge would fail under these conditions at some point – and it did. (5AER000852:12-5AER000853:11; 5AER000900:6-21).

Failure to file a post-verdict motion for judgment as a matter of law, precludes appellate review of sufficiency of the evidence to support the verdict. *See Nitco Holding Corp. v. Boujikian,* 491 F.3d 1086 (9th Cir. 2007) (explaining the Supreme Court's decision in *Uniterm Food Systems, Inc. v. Swift-Eckrich, Inc.,* 546 U.S. 394

(2006), precludes even plain error review when a party fails to file a Rule 50(b) motion). Otherwise, as the district court found, a reasonable juror could conclude Union Pacific learned *or should have learned* of a potential hazard with the flatcar bridge. (1AER000004:11-16). Because the weight of the evidence demonstrated Union Pacific *should have learned* of the hazard so as to ensure the safety of its employees, Gibbons asks this Court to affirm the district court's decision.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY UPHOLDING DAMAGES AWARDED BY THE JURY

### A. Under 9th Circuit Authority, Gibbons' Expert Was Not Required To Discount Future Medical Damages To Present Value, As Evidence of Present Value Was To Be Offered, If At All, by Union Pacific.

The district court properly allowed Gibbons' expert, Dr. Dunn, to testify regarding future medical damages without reducing to present value. Union Pacific did *not* raise this issue in its underlying motion to alter or amend the judgment, et al. (2AER00053-67). Union Pacific now claims the jury should have been instructed to discount its damages award to present value, citing *Monessen Southwestern Ry. Co. v. Morgan,* 108 S.Ct. 1837, 1844, 1845 (1988) (UP Br. 36).

In actuality, reducing future damages to present value is a defendant's concern, while a plaintiff's interest is that the jury properly assess inflation. *Passantino v. Johnson & Johnson Consumer Prods*., 212 F.3d 493, 509 (9th Cir. 2000); *Alma v. Manufacturers Hanover Trust Co.*, 684 F.2d 622, 626 (9th Cir. 1982).

*Passantino* dealt with *Monessen*, noting there, the Supreme Court reversed after the trial judge told the jury it *could not* discount its damage award to present value. *Passantino,* 212 F.3d at 508-509 (citation omitted). Such was also the case in another opinion cited by Union Pacific where the lower court was reversed due to its "refusal" to allow an instruction on present value. *St. Louis Southwestern Ry. Co. v. Dickerson,* 105 S.Ct. 1347, 1349 (1985); UP Br. 38. This is in not the case here.

Elaborating, *Passantino* stated,

> The district court refused to give the instruction here because there was no evidence presented as to what the appropriate discount rate should be. This decision was correct, because under Washington, a present value instruction should not be given where no evidence of appropriate discount rates has been introduced. Thus, the rule applied by the district court was completely consistent with *Monessen* and the relevant Washington law."

*Passantino,* 212 F.3d at 509 (internal citation omitted).

Regarding Washington's rule that a present value instruction should not be given absent evidence of an appropriate discount rate, the *Passantino* decision noted, "[t]his also the rule in the Ninth Circuit. *See Alma v. Manufacturers Hanover Trust Co.*, 684 F.2d 622, 626 (9th Cir. 1982)." *Passantino,* 212 F.3d at 509 fn 13.

In *Alma,* a federal Jones Act case (46 U.S.C. § 688), an undiscounted award of damages to a victim injured on a ship owner's craft was affirmed, because in the

37

absence of evidence from either party as to what an appropriate discount rate or rate

of inflation might be, a lump damages award was appropriate.

> Because [defendant/appellant] had presented no competent evidence of
> the rate, the district court found that no discount was appropriate.
> Similarly, [plaintiff/appellee's] failure to present competent evidence
> of inflationary factors was held to defeat any claim to an adjustment for
> inflation. The fairest and most reasonable damage award is one which
> takes into account both the discount and the adjustment for inflation.
> With such an award the plaintiff is made whole without receiving a
> windfall at the defendant's expense. However, this preference does not
> relieve either party of the burden of presenting evidence as to the
> award's computation. Each of the two elements must be independently
> established by competent evidence.

*Alma,* 684 F.2d at 626 (citations omitted).

> The court went on to hold:

> *Where, as here, neither party provides competent evidence of the*
> *inflation rate or the discount rate, the district court must make a lump*
> *sum award that is not adjusted for either factor.* We specifically reject
> [defendant/appellant's] claim that the trial judge is obligated to
> determine an appropriate discount rate without evidence to reach that
> determination. . . . The method of computation of the lump sum award
> was correct in view of the parties' failure to provide competent evidence
> of either the present value discount or the inflation rate. We therefore
> affirm the judgment of the district court.

*Id.* at 626, 627 (emphasis added).

The jury was not instructed on present value and Gibbons' counsel did not

argue or insinuate figures should be reduced to present value. (2AER000070-115).

38

If such evidence or instruction was to occur at all, it was incumbent upon Union Pacific to see to it.

### 1. Union Pacific was not prejudiced by the jury's award of $500,000.00 for future medical damages.

Union Pacific asserts it was prejudiced, because during closing argument Gibbons' counsel demonstrated how the special verdict form could be completed as to future medical expenses, but "did not clarify that the number needed to be reduced to present value." UP Br. 37-38. Prejudice results, Union Pacific says, because the jury awarded $500,000.00, which was more than $400,461.00, to which Dr. Dunn testified. Union Pacific, however, agreed to this special verdict form, which includes the phrase "*reduced to present value*" under both "Lost wages and benefits in the future" and "Medical and hospital expenses likely to be incurred in the future," and otherwise, failed to introduce evidence of a discount rate, and neither objected at the time nor raised this issue in its underlying motion to alter or amend the judgment, et al. (2AER000175:15-24; 2AER00053-67).

Union Pacific cites to 2AER000049-51 in the record, which is merely the completed verdict form and otherwise, cites no authority that counsel may not utilize the verdict form during closing argument. The citation does not support Union Pacific's allegation that counsel argued "present value" during closing. Union Pacific also cites to a ten-page span of Gibbons' closing argument. (2AER000169:4-

2AER000179:20).  However, nowhere does counsel discuss or even elude to present value.  *Id.*

Union Pacific cites to a final section of record in purported support of its assertion Gibbons' counsel argued or implied figures regarding present value. (2AER000175:15-24).  However, there, counsel is merely discussing the future surgery figures to which Dr. Dunn testified.  (6AER001150:2-24).

Union Pacific reliance on *Ollier v. Sweetwater Union High Sch. Dist.,* 768 F.3d 843 (9th Cir. 2014) is misplaced.  The case has nothing to do with present value. Rather, it simply states abuse of discretion is the applicable standard for review and that a party must also show prejudice.  Union Pacific, however, cannot be said to have been prejudiced, when it never sought to submit evidence of a discount rate for either the district court to apply or so as to instruct the jury.  It now seeks to obtain relief for its own failing, recasting it as the district court's "error," which led to its "prejudice."  UP Br. 38.  In fact, regarding prejudice, the *Ollier* court found the complaining party there was not prejudiced because it was on notice.  *Id.* at 862. Likewise, Union Pacific did not lack notice regarding the rule of law with respect to present value in the 9th Circuit.

2. The jury's award of $500,000.00 for future medical damages is not excessive.

Unless the amount of damages is "grossly excessive or monstrous," a court will not disturb an award. *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1040 (9th Cir. 2003). In determining whether a damages award is excessive, a district court views the evidence concerning damages in a light most favorable to the prevailing party. *Fenner v Dependable Trucking Co., Inc.,* 716 F.2d 598, 603 (9th Cir. 1983).

Here, the evidence showed the herniations in Gibbons' thoracic, cervical and lumbar spine were caused by the homemade bridge collapse. (7AER001303:8-12; 10AER002166-10AER002168; 10AER002247:6-9; 10AER002169; 10AER002247:5-25). This was confirmed by both Gibbons' treating physician and Dr. Dunn. (7AER001376:18-25). As a result of the incident, Gibbons was forced to undergo cervical fusion surgery. (10AER002259:13-10AER002260:5, 16-20). Gibbons went back to work, for now, but does so medicated and in pain all while continuing to experience radiating headaches. (10AER002262:1-16).

Dr. Dunn testified Gibbons would require additional back and neck surgeries in the future (6AER001150:2-21), and that Gibbons' ability to lift, twist, bend, stoop and tolerate bouncing up and down would be impacted. (6AER001157:9-58:20). In addition to back surgery and an additional neck surgery, Dr. Dunn testified thoracic

surgery will be reasonably necessary, should Gibbons' condition continue to deteriorate in that area and impair his ability to function. (6AER001145:1-14; 6AER001149:11-6AER001150:1, 15-20; 6AER001154:20-6AER001156:7; 7AER001388:17-7AER001389:11; 7AER001391:20-7AER001392:9). The $400,461.00.00 figure to which Dr. Dunn testified *only* accounted for the two future surgeries and hospital stays. (6AER001150:2-21). However, the evidence also demonstrated certain future impacts to Gibbons' health and mobility, which will impact his ability to perform his job, as well as the need for pain management. (6AER001157:9-6AER001158:20; 10AER002262:1-16).

In FELA cases, the Supreme Court has repeatedly emphasized that reviewing courts are not permitted to set aside jury verdicts "merely because the jury could have drawn different inferences or conclusions or because [the courts] feel that other results are more reasonable." *Tennant v. Peoria & Pekin Union Ry. Co.,* 321 U.S. 29, 35 (1944). *Lavender v. Kurn,* 327 U.S. 645, 653 (1946) ("It is no answer to say that the jury's verdict involved speculation and conjecture.")

To support its assertion the future medical damages' verdict was excessive, Union Pacific cites *Beachy v. Boise Cascade Corp.,* 191 F.3d 1010 (9th Cir. 1999). However, in *Beachy,* the court held that the district judge permissibly refused to instruct the jury on law when no supporting evidence was present; thus, the

evidentiary error did not require reversal as the jury more probably than not would have found for the recovering party anyway.

To the extent *Beachy* is applicable at all, Gibbons is distinguishable because substantial evidence supporting the verdict was presented. Jury Instruction 12, to which Union Pacific agreed, made clear the jurors were to apply their everyday common sense to draw reasonable inferences from the evidence and were not limited to what they saw and heard in court. (3AER00501:13-24.) The jurors returned a verdict for future medical damages that was not excessive, given the evidence and the reasonable inferences they permissibly drew from it.

B.  The District Court Properly Allowed Gibbons' Expert To Testify Regarding Future Medical Damages And Lost Earning Capacity.

To obtain a new trial based on erroneous evidentiary rulings, the moving party must show that the rulings were both erroneous and substantially prejudicial. *See Ruvalcaba v. City of Los Angeles,* 64 F.3d 1323, 1328 (9th Cir. 1995). Here, Union Pacific misinterprets two pre-trial district court rulings. UP Br. 23, 39.[3] Otherwise,

---

[3] Appellant's opening brief asserts in its Argument section that Dr. Dunn should not have been permitted to testify regarding lost work capacity. (UP Br. 39). Union Pacific also asserts in its Statement of the Case that Dr. Dunn should have been precluded from testifying as to future medical damages. (UP Br. 23). However, Union Pacific's brief does not expressly request that the pre-trial rulings be overturned. Since its brief is unclear and inconsistent, Gibbons is forced to address these issues herein.

Union Pacific has failed to show either ruling is erroneous and has made no effort to show there was any resulting substantial prejudice.

First, at the close of discovery, Gibbons filed a motion for leave to designate an additional expert economist, Terrence Clauretie, Ph.D., to further testify regarding future damages owing to the nature and extent of Gibbons' injuries. Magistrate Judge Hoffman denied Gibbons' expert economist designation, because it was untimely. (11AER002652:1-10). Since the motion was expressly limited to Gibbons' request to add Dr. Clauretie as an economic expert, there was no blanket prohibition of evidence of Gibbons' future damages by Dr. Dunn, who had been timely designated. (1AER000005:13-15; 11AER002649-11AER002652). Indeed, this was acknowledged by District Court Judge Gloria Navarro in her ruling denying Union Pacific's motion to alter or amend the judgment, et al., when she noted, "[a]bsent from Judge Hoffman's ruling was any mention of prohibiting future damages in general. In fact, the Order explicitly references Dr. Dunn's report as putting future economic injury at issue." *Id.* Allowing Dr. Dunn to testify as to future damages was clearly, not error.

Second, at calendar call, Union Pacific orally raised a new issue claiming Dr. Dunn should not be permitted to testifying regarding future damages *at all*, including as to reduced work life capacity. (UP Br. 39; 11AER002616:19-11AER002617:2).

The district court determined Dr. Dunn could testify regarding future medical services, as well as limitations on functionality that Gibbons would experience, but a "five to ten" year reduced work life was "an argument that you can make in closing argument." (11AER002628:3-4; 11AER002632:5-22). When the district court formally ruled on Union Pacific's subsequently submitted motion *in limine,* the court granted in part and denied in part stating: "[Dr. Dunn] does have the experience to testify as to future medical issues that plaintiff may face and that accompany physical restrictions, but he is not qualified to say how this will affect plaintiff's work life *specifically a reduction of five to ten years*." (7AER001356:8-12) (emphasis added). (7AER001356:18-22). The district court did not amend its earlier ruling that Gibbons' counsel could argue in closing regarding a specific work life reduction. (11AER002632:5-22).

### C. The District Court Properly Permitted Gibbons' Counsel To Include Closing Argument Regarding Lost Earning Capacity.

To recover lost wages under FELA, Gibbons need not "prove that in the near future he will earn less money than he would have but for his injury." *Gorniak v. Nat'l R.R. Passenger Corp.,* 889 F.2d 481, 484 (3rd Cir. 1989). Rather, in a FELA case, a plaintiff may recover compensatory damages based more generally on diminution in his ability to earn a living or the narrowing of economic opportunities. *Id.* The district court expressly authorized Gibbons' counsel to argue in closing

45

regarding a specific work life reduction. (11AER002632:5-22). The portion of argument counsel made to the jury regarding lost earning capacity was generally and properly supported by the impact Gibbons' injuries, surgery and future surgeries will have on his ability to earn a living.

At the onset, none of Union Pacific's citation to the record supports its assertion that Gibbons' counsel made any improper argument. Union Pacific's citation to 2AER000120:5-13 has nothing to do with work life years; rather, it is transcription of district court administrative business.[4] Union Pacific's second citation to 2AER000168:19-25 is merely Gibbons counsel informing the jury during closing argument to remember that this is "Gibbons' only day in court," that even if he has another surgery, "[w]e don't get to come back in five years . . . and talk to you about some additional damages." *Id.* Clearly, this argument was making clear the jury understood the totality of the claim was being decided in that one proceeding. Union Pacific did *not* object at trial to this portion of closing argument. (2AER000168:19-25).

---

[4] To the extent Union Pacific intended to instead cite 2AER000131:5-13, this portion of Gibbons' counsel's argument similarly is merely informed the jury that the totality of the claim was being decided, by them, at this moment: "[T]his is our one trial so all the evidence in this case has to be presented in one trial. We don't come back in ten years and say there's been another surgery, there's been other job performance issue, all those have to be presented. . . ." Union Pacific did *not* object at trial to this portion of closing argument. 2AER000131:5-13

Union Pacific's final citation is to 2AER000174:5-8. A fuller examination of that portion of argument puts the entirety of counsel's statements in context. There, counsel was telling the jury that Gibbons is 42 years old and earns $70,000.00 per year; that he does not have a job guaranteed for life or even a day; that Dr. Dunn testified Gibbons would be impacted by his injuries and surgeries; that the typical work cessation age is 65, and suggested to jurors how they could go about calculating lost wages, if, for example, Gibbons' work life was cut short by ten years -- "then that amount would be $700,000." (2AER000173:7-2AER000174:19; 7AER001310:23-7AER001311:6; 7AER001356:8-12; 10AER002269:2-5). This argument did not violate the court's prior ruling, because counsel did not argue the evidence supported a specific lost wage span of years, and in any event, the court did not preclude counsel from doing so. (11AER002632:5-22). Nothing about this presentation reflects improper work life capacity argument. The district court agreed. (1AER000005:16-23).

The evidence showed Gibbons himself had testified regarding his current age, salary, benefits, job functions and personal impairments, all of which constitute relevant evidence regarding impairment of work life expectancy, especially in conjunction with evidence regarding Gibbons' medical treatment. (6AER001158:8-20; 7AER001296:13-7AER001297:2; 7AER001310:23-7AER001311:6;

10AER002269:2-5). Gibbons also testified he still must take prescription pain killers and still experiences pain and suffering as a result of his permanent back injuries. (10AER002255:9-25; 10AER002262:1-16). It was certainly reasonable for the jury to conclude that, at some point, the pain would become intolerable to the extent Gibbons may no longer be employable by Union Pacific and that his prospects are limited with just a high school education and skilled as a laborer only. (10AER002178:22-10AER002179:3; 10AER002182:21-23).

To the extent Union Pacific is now contending that "excessiveness" is shown by the jury awarding more ($1,500,000.00) than Gibbons' counsel used in his example for completing the verdict form ($700,000.00), the district court weighed in. (1AER000002:2; 2AER000174:5-8). "While the discrepancy between amount requested and the verdict can serve as evidence that the jury was influenced by prejudice or passion, Defendant does not raise this argument in its Motion ***nor does the Court find it meritorious***." (1AER000007:8-11) (emphasis added).

Otherwise, Union Pacific makes no showing of prejudice beyond pointing to the fact it lost. This is insufficient:

> The burden of making a concrete showing of prejudice resulting from improper closing argument falls upon appellant. In evaluating the likelihood of prejudice from the comments, we should consider the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the

48

> strength of the case, and the verdict itself. . . . We note, however, that
> this remedy is available only in extraordinary cases.

*Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1193 (9th Cir. 2002) (internal quotation

marks omitted; citations omitted); see also *Cooper v. Firestone Tire & Rubber Co.*,

945 F.2d 1103, 1107 (9th Cir. 1991) (declining to find reversible error where "the

alleged misconduct occurred only in the argument phase of the trial . . . the remarks

were isolated rather than persistent, . . . most of counsel's comments were not

objected to at trial and appellants did not move for a mistrial at the end of the

argument").

As the district court stated, "[t]he necessarily speculative nature of this inquiry

is not grounds for removing lost earnings from a jury," citing *Colyer v. Consol. Rail

Corp.,* 114 F.App'x 473, 482 (3rd Cir. 2004). *Colyer* further noted that a diminution

in ability to earn a living may occur through a decreased ability to weather adverse

circumstances, such as a discharge or lay-off, or to voluntarily leave the defendant

employer for other employment. *Id.*

Jury Instruction 12, to which Union Pacific agreed, made clear the jurors were

to apply their everyday common sense and judgment to draw reasonable inferences

from the evidence and that in doing so, they were not solely limited to what they saw

and heard in court. (3AER00501:13-24.) Evaluating an intangible like the loss of

work life is precisely the type of fact issues best left for a properly instructed jury.

Indeed, the Court's role is not to second guess how the jury weighed specific testimony. *Manfred v. Superstation, Inc.,* 365 F.App'x 856, 858 (9th Cir. 2010). In FELA actions, "the jury's power to engage in inferences is significantly broader than in common law negligence actions." *Pierce,* 823 F.2d at 1370.

Finally, in a footnote, Union Pacific asserts the proper measure of damages in a FELA action is net wages after deductions, citing *Norfolk & W. Ry. Co. v. Liepelt,* 100 S.Ct. 755 (1980). Because Gibbons testified he makes up to $70,000.00 per year, Union Pacific concludes the jury did not award Gibbons his after-tax income. (10AER002269:2-5). Union Pacific makes no attempt to support this conclusion.

First, *Norfolk,* a wrongful death action, did not hold, as Union Pacific alleges, that the proper measure of damages in a FELA case is after-tax income losses, not gross wages. Rather, the Supreme Court held it was error for the trial court to refuse a requested jury instruction as to the nontaxability of personal injury awards. *Id.* "[To] put the matter simply, giving the instruction can do no harm." *Id.* at 759 (citation omitted). Moreover, in the brief *dicta* where net versus gross income was mentioned, the Court narrowly stated, "*[i]n a wrongful-death action under the FELA*. . . . [i]t is his after-tax income, rather than his gross income before taxes, that

provides the only realistic measure of his ability to support his family." Emphasis added. *Id.* at 757.

Second, Union Pacific cites no evidence that the jury used the figure of $70,000.00 per year in income to arrive at the lost earnings and benefits award. The jury could have calculated Gibbons' wages at $60,000.00 per year, which was the lower end of the range Gibbons provided, and concluded Gibbons' inability to perform his job was imminent, based on his injuries, thus, requiring a retirement 23 years early. (10AER002269:2-5). This would amount to $1,380,000.00, plus, perhaps a sum of $120,000.00 for lost benefits – or the jury could have calculated numerous other conceivable variations, accessing their permissible speculation, common sense and judgment. Moreover, the jury could certainly have accounted for future increases in wages in their award.

Third, it is pure guesswork on the part of Union Pacific that the jury failed to award after-tax income losses. In fact, the jury was clearly instructed to do so in Jury Instruction 35: "A prevailing FELA plaintiff is entitled to recover his after-tax income losses, not gross wages, and his award is not subject to federal income taxation." (3AER000514:25-3AER000515:3). As shown above, the $1,500,000.00 award was clearly capable of being calculated in a manner that reflected the jury's

51

adherence to the instruction to award after-tax wage loss only, plus, common sense benefits.

Gibbons produced at trial "competent evidence . . . that his injuries have narrowed the range of economic opportunities available to him" and he likewise "show[ed] that his injury has caused a diminution in his ability to earn a living." *Gorniak,* 889 F.2d at 484. The jury's award of $1,500,000.00 in lost wages and benefits is supported by the record, permissible speculation, common sense and judgment to draw reasonable inferences from the evidence.

>    D.    <u>The Jury's Award For Pain And Suffering Is Neither Against The Clear Weight Of The Evidence Nor Excessive.</u>

Union Pacific asserts Gibbons did not set forth "substantial evidence" to support the $3,000,000.00 award for pain and suffering, where Union Pacific combines both the $1,500,000.00 for mental and emotional humiliation or pain and anguish, and the $1,500,000.00 for physical pain and suffering. (UP Br. 41; 1AER000002:1-4). However, "[t]he ground that there was not substantial evidence to support the jury's verdict . . . is not before this Court. Appellant did not, at the close of the evidence or case, interpose a motion for a directed verdict." *Oslund v. State Farm Mutual Automobile Insurance Co.*, 242 F.2d 813, 815 (9th Cir. 1957). "Thus the issue before us is whether [the party] presented *any* evidence. *Farley*

*Transp. Co. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1349 (9th Cir. 1985) (emphasis in original).

With respect to Gibbons' mental and emotional humiliation or pain and anguish, the verdict is amply supported by the record. Gibbons testified, "I wasn't very happy with the way anything was going. I was probably ornery all the time because I'd just think I would be feeling better and it would come back. There was very little time with relief from it." (10AER0002258:1-5). This caused problems with Gibbons' marriage: The relationship suffered; intimacy suffered. (10AER0002264:11-14). Mrs. Gibbons confirmed their relationship and intimacy suffered. (3AER000313:14-3AER000314:12). In fact, it was to the point, she consulted a therapist. *Id.* Gibbons headaches also impacted his mood, as he was difficult to be around. (10AER002190:20-23.)

Gibbons testified he is very against prescription medications, as he's been around them and knows them to be very addictive. (10AER0002254:20-24). In fact, his friend died from them. *Id.* Still, he has had to take prescription medications as a result of this incident, and one of the mediations he was initially prescribed made him unable to do anything. (10AER002255:22-24). He now faces a lifetime of Lyrica. (10AER002262:11-16).

53

Gibbons also experienced distress regarding the cervical fusion: "Surgery was real scary to me in the neck for sure. I didn't know whether the pain was worth the risk to me to have somebody cut into your neck." (10AER002259:14-16). Now, he faces additional surgeries in the future. (6AER001150:2-21). The incident has also left him with panic symptoms near bridges. (7AER001296:2-4).

Next, Union Pacific raises, but does not argue or present authority, for the proposition that Gibbons' "[p]hysical pain and suffering" award of $1,500,000.00 was not supported by substantial evidence. UP Br. 43. However, with respect to Gibbons' physical pain and suffering, the verdict is, again, amply supported by the record.

As a result of his injuries, Gibbons had a debilitating headache that lasted three weeks and nothing would help. (10AER002254:13-17.) It was his "last straw." *Id.* Mrs. Gibbons confirmed that Gibbons' head hurt constantly. (AER00313:17-18). The pain, "It wasn't fun. Like I say, whenever I would do strenuous stuff, it would definitely be a lot worse. Pulling, anything jerking or pulling on my back is really hard on me. That's probably my worst part of it." (10AER002254:1-4.)

Hence, Gibbons was forced to undergo cervical surgery, which caused his neck to be permanently fused with hardware, including screws that prohibit his neck

from bending. (10AER002260:17-20). "They go in there and they pull your esophagus to the side, and they screw in some – I know it looked like a medieval type of headdress on you. I had two big old scars right here (indicating), two holes on the side of my head from them." (10AER002260:24-10AER002261:3)

Gibbons confirmed that bending, lifting, driving and standing all made his pain worse. (10AER002246:18-20). It also hurts when he tries to play with his child. (10AER002193:4-22). Things have changed for him, in large part, because he cannot handle the up and down motion. *Id.*

Dr. Dunn testified Gibbons would require additional back and neck surgeries (6AER001150:2-21), and that Gibbons' ability to lift, twist, bend, stoop and tolerate bouncing up and down would be impacted. (6AER001157:9-58:20). Gibbons was told by Dr. Colledge the low back surgery will be dangerous. (10AER0002253:914).

The speculative nature of mental and physical suffering does not provide grounds to alter the verdict. *See S. Pac. Co. v. Guthrie,* 180 F.2d 295, 303 (9th Cir. 1949); *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140 (2nd Cir. 2014). As FELA cases often involve evaluating intangible factors, it follows that courts frequently uphold large verdicts in such cases. *See DeBiasio v. Illinois Cent. R.R.,* 52 F.3d 678, 688-689 (7th Cir. 1995) (compiling large awards in other FELA cases); *Ahlf v. CSX Transp., Inc.,* 386 F.Supp.2d 83, 90 (N.D. N.Y. 2005) (finding that a $1,750,000.00

pain and suffering award for a serious back injury and major surgery falls within the "reasonable range of verdicts").

The following three verdicts support the herein verdict, especially given they are each a quarter century old and thus, a modern verdict would necessarily be larger. In a 26-year old case, a $3,900,000.00 jury verdict was upheld for a railroad worker who underwent a laminectomy and insertion of steel plates into lumbar spine. *Lewis v. Illinois Cent. R.R. Co.,* 600 N.E.2d 504 (1992). In a 25-year old case, a railroad worker suffered a neck injury requiring cervical diskectomy and fusion. The court sustained a $3,500,000.00 verdict. *Dickerson v. Norfolk & W. Ry. Co.,* No. 87-C-153, (Brooke County, W. Va. Cir. Ct. July 2, 1991). In a 25-year old case, a verdict of $2,300,000.00 was upheld for an individual with a back injury sustained after falling only five feet who did not require continued medical treatment or prescription pain medication and who could lift objects weighing under fifty pounds. *Frazier v. Norfolk & W. Ry. Co.,* 996 F.2d 922 (7th Cir. 1993).

Union Pacific cites *Longoria v. Hunter Express, Limited,* 932 F.3d 360, 366 (5th Cir. 2019)[5], for holding an award of $1 million in pain and suffering is too high where pain could be managed with stretching and ibuprofen. However, there, the

---

[5] Union Pacific cites *Longoria* as a 9th Circuit case, but it is not. *Longoria* is a 5th Circuit case. Gibbons has included the correct citation herein.

party had not sustained injuries to three regions of his back, and did not require three future back surgeries. The cases are not analogous.

Union Pacific also raises the argument that since the jury already awarded Gibbons future medical costs, as well as lost wages and benefits, Gibbons' award of future mental and emotional humiliation or pain and anguish should be stricken, since they constitute "multiple awards" resulting in "overcompensation." However, in so arguing, it fails to grasp the distinction between medical expense, lost wages/benefits and mental anguish. Each of these are separately permissible. Union Pacific cites *Neill v. Diamond M. Drilling Co.,* 426 F.2d 487, 492 (5th Cir. 1970), in support. However, there, the lower court entered judgment for a *lump sum* without allocating damages to the various elements that the court had considered. Contrary to Union Pacific's representation that the appellate court in *Neill* made a "finding" that there was overlap in the damages award between lost wages and mental anguish, et al., the court merely remanded for additional findings relative to whether that was, in fact, the case, among several other reasons. *Id.* at 492.

When a damage award is supportable, it will not be disturbed on appeal unless it is grossly excessive, monstrous or shocking to the conscience. *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir. 1985). "Jury verdicts are due considerable deference." *Kern v. Levolor Lorentzen Inc.,* 899 F.2d 772, 775 (9th Cir.

1990). Here, the jury's award of $1,500,000.00 for pain and suffering, and $1,500,000.00 for emotional anguish is supported by the record, permissible speculation, common sense and reasonable inferences from the evidence.

E.     A Remittitur Is Not Appropriate.

Because Union Pacific failed to demonstrate the jury verdict was excessive, a Rule 59 remittitur is clearly inappropriate. The case cited by Union Pacific, *Fenner v. Dependable Trucking Co.,* 716 F.2d 598, 603 (9th Cir. 1983), actually requires the court to "view the evidence concerning damages in a light most favorable to the prevailing party," to determine whether damages are excessive. After so doing herein, Gibbons submits the jury verdict should stand.

///

///

///

///

///

///

///

///

///

58

# CONCLUSION

For the foregoing reasons stated, the judgment of the district court should be affirmed in all respects.

Dated:  September 30, 2019

BRENT COON & ASSOCIATES

/s/ *James A. Morris*
James A. Morris, Jr. (Pro Hac Vice)
Brent W. Coon (Pro Hac Vice)
BRENT COON & ASSOCIATES
4111 W. Alameda Avenue, Suite 611
Burbank, CA 91505
Telephone (747) 283-1144
*jim.morris@bcoonlaw.com*
*brent@bcoonlaw.com*

WETHERALL GROUP, LTD.

/s/ *Peter C. Wetherall*
Peter C. Wetherall (NV Bar No. 4414)
9345 West Sunset Road, Suite 100
Las Vegas, NV 89148
Telephone (702) 838-8500
*pwetherall@wetherallgroup.com*

*Attorneys for Plaintiff/Appellee Greg Gibbons*

## STATEMENT OF RELATED CASES

The undersigned hereby certifies that he is now not aware of any related cases in this Court.

Dated:  September 30, 2019

BRENT COON & ASSOCIATES

/s/ *James A. Morris*
James A. Morris, Jr. (Pro Hac Vice)
Brent W. Coon (Pro Hac Vice)
BRENT COON & ASSOCIATES
4111 W. Alameda Avenue, Suite 611
Burbank, CA 91505
Telephone (747) 283-1144
*jim.morris@bcoonlaw.com*
*brent@bcoonlaw.com*

WETHERALL GROUP, LTD.

/s/ *Peter C. Wetherall*
Peter C. Wetherall (NV Bar No. 4414)
9345 West Sunset Road, Suite 100
Las Vegas, NV 89148
Telephone (702) 838-8500
*pwetherall@wetherallgroup.com*

*Attorneys for Plaintiff/Appellee Greg Gibbons*

60

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,876 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using [insert name and version of word processing program] Times New Roman 14-point font.

Dated: September 30, 2019   BRENT COON & ASSOCIATES

            */s/ James A. Morris*
            James A. Morris, Jr. (Pro Hac Vice)
            Brent W. Coon (Pro Hac Vice)
            BRENT COON & ASSOCIATES
            4111 W. Alameda Avenue, Suite 611
            Burbank, CA 91505
            Telephone (747) 283-1144
            *jim.morris@bcoonlaw.com*
            *brent@bcoonlaw.com*

            WETHERALL GROUP, LTD.

            */s/ Peter C. Wetherall*
            Peter C. Wetherall (NV Bar No. 4414)
            9345 West Sunset Road, Suite 100
            Las Vegas, NV 89148
            Telephone (702) 838-8500
            *pwetherall@wetherallgroup.com*
            *Attorneys for Plaintiff/Appellee*
            *Greg Gibbons*

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 30, 2019

BRENT COON & ASSOCIATES

/s/ *James A. Morris*
James A. Morris, Jr. (Pro Hac Vice)
Brent W. Coon (Pro Hac Vice)
BRENT COON & ASSOCIATES
4111 W. Alameda Avenue, Suite 611
Burbank, CA 91505
Telephone (747) 283-1144
*jim.morris@bcoonlaw.com*
*brent@bcoonlaw.com*

WETHERALL GROUP, LTD.

/s/ *Peter C. Wetherall*
Peter C. Wetherall (NV Bar No. 4414)
9345 West Sunset Road, Suite 100
Las Vegas, NV 89148
Telephone (702) 838-8500
*pwetherall@wetherallgroup.com*
*Attorneys for Plaintiff/Appellee*
*Greg Gibbons*